265 F.2d 920
 Rudolph John TOHAN, Appellant
v.
JOSEPH T. RYERSON AND SON, INC., a Delaware Corporation (Custodis Construction Co., Inc., a Delaware Corporation).
Norman WILSON, Appellant
v.
JOSEPH T. RYERSON AND SON, INC., a Delaware Corporation (Custodis Construction Co., Inc., a Delaware Corporation).
 No. 12771.
 No. 12772.
 United States Court of Appeals Third Circuit.
 Argued March 19, 1959.
 Decided May 6, 1959.
 
 Samuel Polsky, Philadelphia, Pa. (M. Alan Bank, Thomas Z. Minehart, Philadelphia, Pa., on the brief), for appellants.
 Francis E. Marshall, Philadelphia, Pa. (Davis, Marshall & Crumlish, Philadelphia, Pa., on the brief), for appellee Joseph T. Ryerson and Sons, Inc.
 Before McLAUGHLIN and HASTIE, Circuit Judges, and MORRILL, District Judge.
 McLAUGHLIN, Circuit Judge.
 
 
 1
 In these personal injury negligence actions the court on motion set aside verdicts in favor of the plaintiffs and ordered that judgments n. o. v. be entered in favor of the defendants. Appellants complain that in so doing the court failed to view the evidence in the light most favorable to the plaintiffs.
 
 
 2
 The problem is evidential, simply whether, irrespective of any question of credibility, there is sufficient testimony in this record to warrant submission to a jury of plaintiffs' claims against Ryerson. It seems best to state the evidence on behalf of the plaintiffs at some length in order that their version of the accident, events leading up to it and their expert's opinion in connection therewith be completely developed.
 
 
 3
 Appellants' employer, Custodis Construction Co., Inc., is a constructor of chimneys and during the critical period was erecting a chimney in Philadelphia. Appellants are bricklayers and, with others, were engaged in brick lining the stack. Arthur B. Bailey was the foreman in charge of the job. Two beams were needed to support the scaffolding for the work inside the chimney. In the fifteen years Bailey had been foreman such beams, with the scaffolding and other necessary equipment in connection therewith, had been supplied by the Patent Scaffolding Company. Apparently because of the then current steel strike Custodis did not have any beams and for the first time, through Bailey went to Ryerson for the beams. Testifying as to his talk with the Ryerson clerk, a college student part time employee, Bailey said: "I went into Ryerson, the office there, and there was a girl receptionist like at the entrance. I asked her to show me a salesman that could handle my order, and she located a salesman and sent him over to the desk and we talked there. He wanted to know what I was interested in. I told him two I-beams, and he said he didn't know whether they had any that length. I wanted them 26 feet long, and he went back to check with some other fellow at another desk and come back to me and he started talking to see what amount of weight and just how the beams would be placed and so forth, which I told him to my best —. Q. What did you tell him? Suppose you tell us exactly. A. I told him I needed two beams to lay across the top of the smokestack 23 feet in diameter at the top, and on these beams would be the jacks, the hangers, the cables and the jacks and the scaffold that would support the men that they could lay the brick for the lining in this chimney, and I told him approximate, not in weight, but approximate, what would be placed on the scaffold, like three or four tubs of mortar, four or five tubs of bricks, and three or four or five bricklayers, plus the weight of the scaffold, and asked him if they could furnish me anything that would take care of that; and he went back and checked with evidently his foreman or boss and come back to me and said they had two 40-foot beams down in their warehouse or basement or where they store their beams, and that they would take them and cut those for me to the length that I wanted, and I said that would be all right, would they deliver them on the job, which they did about three days later." The delivery slip called for "two BMWF 8-inch by 13 pounds 26-foot cut, net weight 676 pounds" and "that is precisely what was delivered * * *." (Emphasis supplied.)
 
 
 4
 It was Bailey's responsibility as the experienced chimney constructor to supervise installation of the beams and the scaffold and he did this. The two beams purchased were the only ones Ryerson had available. Bailey said he had a blue print of the chimney in his hip pocket while at Ryersons but don't remember whether he showed it to anyone. He was asked and replied as follows:
 
 
 5
 "Q. But from the beam itself and the top of the chimney did you have anything like bolts or anchors of any kind to hold that beam in position on top of the chimney? A. No, it wasn't necessary."
 
 
 6
 In his deposition Bailey had said he did not mention to the Ryerson salesman anything about how far off center the beams were going to be placed. On the stand at the trial asked, "So that you didn't tell anything to this man about where on top of the chimney the beams would be placed, did you?" he replied, "I don't remember, sir." He admitted that the further off center the beams were placed the greater weight-bearing capacity they would have. He didn't remember telling anything to the Ryerson man as to where he was going to put the cables and U-bolts and fasten them on the beams which would be an extremely important factor in determining the size load the beams would take. He relied on his own ability in the use of the beams and in the way (stet) [weight?] to be placed on them.
 
 
 7
 Appellants stress the fact that their expert, Von Ludwig, testified that "* * according to the standards, this is not a beam, this is a stringer, a secondary support stringer. * * * It is not a primary beam under the ASTM (American Society for Testing Materials.) * * * A stringer is intended as a supporting reinforcing member for primary members. If you are familiar with a bridge construction, for example, the perpendiculars and the horizontals are beams. The interconnecting latticework would be considered stringers, reinforcing stringers. They are always of lighter gauge metal than the primary members. They don't have as much stress capacity upon them as the primary member."[1] (Emphasis supplied.) He considered as a major element in his calculations that there would be a lack of equilibrium of load and that the scaffold carried a live load and "* * * the live effect of movement and working would be imposed upon the beams at the top supporting it * * *" and "* * * entailed inevitably some side-to-side motion." He stated that taking these factors into account "* * * you can then begin to see why one beam was caused to deflect, bend, or twist inwardly and topple over, and as it toppled, as shown by the beam itself, folding at the weakest point, which would be the center of a 19-foot free span, the U-bolts, which are not clamped, they are simply hung around it with the U-bolt at the bottom, slid inward, and as they slid inward, the whole thing was bent into a U and dropped down into the chimney."
 
 
 8
 He said that the failure of the beam was that "* * * in my opinion, based on the evidence, the beam was overloaded. * * * It was too weak for the load." (Emphasis supplied.)
 
 
 9
 Asked on cross-examination, in view of the fact that the beams had been used two weeks without problem and on occasion had carried as much as a thousand pounds more weight than at the time of the accident "* * * what do you think made the difference which caused this beam to flip over on its side the day of this accident, if you can tell us?" He said, "I can tell you. Many things. * * * I can yes, definitely. * * * One problem is fatigue. Metals fatigue. If they are so inadequate in strength as to be on the verge of yielding, fatigue becomes an important factor. You have a thin piece of steel where a thick piece of steel should be used. It might carry a large load when new, but because of fatigue, carry less and less, but that's only one factor. Another factor is, where is the load on the platform? If the load in one instance is symmetrically distributed and the stress is symmetrically imposed, in other words uniformly imposed on all four hangers, then the axis of a thousand pounds being distributed among the four, puts a stress of only 250 pounds per U-bolt. Well, that isn't as much as the weight of three men walking across the platform, you see, so where the weights were previously, where the weights were at the time of the accident, regardless of what the total mass was, and the span of time between one large load and the next light load, whether symmetrically or otherwise disposed, all of those are factors to be considered."
 
 
 10
 On further cross-examination the witness was asked: "* * * is it your understanding and did you consider in your supposition here the fact that these U-bolts were able to slide back and forth on this beam?" The answer was, "They are not to slide back and forth on that beam as long as it is flat and undeflected." He was asked and answered:
 
 
 11
 "Q. Suppose that one of these ratchets, slipped, Mr. Von Ludwig, and dropped one side of the scaffold, let us say a foot or two feet, would or would not that be an enabling factor causing this beam to then slip over to its side? A. Yes, if the beam were marginally loaded, that is, without an adequate margin of safety — I don't know that it flipped over on its side, but it would cause it to deflect sideways. There is a difference. In other words, it would cause it to bend and buckle inward sideways, and then after it folded over the edge it would go over on its side, yes, but if you dropped that a foot or two, multiply the weight that you are dropping by the height, and you have the number of foot pounds of impact superimposed on the normal load. That can be a considerable moment of force.
 
 
 12
 "Q. So that you as an expert could not eliminate from this case the possibility that something happened to cause an abrupt jolt or drop, throwing a tremendous or at least a greater amount of force on the one beam and causing it to bend slightly and eventually flip over on its side. A. No. In fact, that is what I meant by dynamic or a live load. That's the reason for a normal engineering margin of safty of five to one over the initial calculated load."
 
 
 13
 Von Ludwig admitted that the beam in its vertical position would sustain six to eight times the weight it would in lying flat. He was then asked and answered: "Q. Well, then, in view of that, Mr. Von Ludwig, would you concede that it would have been desirable to use some device which would have prevented the tilting and the flopping over on the side of this beam? A. Well, yes, I would say it would be desirable." He admitted that if cross pieces had been used to anchor the two beams together their load bearing strength would have been increased from 300 to 500 per cent; they would have had a load bearing capacity up to fifteen to eighteen tons as a total if they had been so prevented from rolling. He would have recommended such bracing without question. If he had been consulted as an expert before the weight was put on these beams he could have made some suggestions which would have greatly increased the safety factor for the men working.
 
 
 14
 In the light of all the testimony most favorable to the plaintiffs there is unmistakably demonstrated that Custodis, through its foreman Bailey, needing beams to support its scaffold inside the chimney it was completing, went to Ryerson for the first time, and purchased the only two beams at hand. Bailey gave the clerk no details on just how they were to be placed or how the scaffolding was to be handled. He relied on his own experienced judgment for those all important elements of the operation. There is no evidence that he knew the clerk was inexperienced but on the other hand it is clear that he did not bother to ascertain the fact. Beyond question Bailey took what Ryerson had and put the beams to use with the scaffold. Under his direct supervision the beams were not anchored together notwithstanding the fact that this would have given them tremendous further weight bearing quality and made it impossible for the key beam to roll over from vertical to its weaker flat side. Bailey never even bothered to secure the hangers on the beams though these slipping towards the center would appreciably lower the beams' weight resistance.
 
 
 15
 Plaintiffs' proofs support the district court in its conclusion that the beams in question were the only ones Ryerson had at the time for delivery; that the selling designation of the beams correctly appeared on the sales slip Bailey signed; that they were subject to Bailey's immediate scrutiny and use; that they functioned adequately on the job for two weeks prior to the accident; that the immediate cause of the mishap was the tilting of an unanchored beam and the sliding of the unanchored U-bolts to the center of the beam when it was in a flat position with resultant unusual and extreme pressures applied to the weakest point of the beam; that the actual tilting of the beam would not have occurred if the beams and scaffold hangers had been anchored; and that had they been so handled the beams were strong enough to support the weight imposed upon them up to the time of the accident.
 
 
 16
 Despite the conduct of Custodis, it must be borne in mind that Bailey, regarding at least the main charge against Custodis, namely, failure to anchor the beams, testified that "it wasn't necessary" to do this. Of itself that defeats the theory of uncontradicted Custodis negligence being the proximate cause of the accident. Under Bailey's evidence if believed Custodis was not at fault in failing to secure the beams.
 
 
 17
 And on plaintiffs' affirmative claims against Ryerson there remains the testimony of Bailey that he ordered I-beams of the Ryerson clerk and told him of their intended use, together with the testimony of Von Ludwig that the beams sold were not primary beams and were too weak for the stated purpose;[2] that primary beams should have been used. This evidence if believed would be indicative of negligence on the part of Ryerson in supplying beams not in accordance with Bailey's request. We think it also created a related jury question as to whether if primary beams had been supplied they would have functioned without collapsing even with the scaffolding as it was.
 
 
 18
 The trial court, holding that the interests of justice required it, granted the appellee a new trial in the event the judgments in its favor be set aside. That order was based on the entire record, including three specific named reasons as to which the court said: "It was developed after trial that the key witness for the plaintiffs (Bailey) had shortly after the accident given a written statement substantially at variance with his sworn testimony at time of trial. The verdict in favor of plaintiff Wilson was definitely excessive and showed lack of consideration on the part of the jury. There was an incorrect reference in the charge of the Court with respect to the liability of Custodis for contribution which, although later corrected, might well have intended to confuse the jury." From our own intensive study of this transcript we fully approve of the court's decision as to a new trial.
 
 
 19
 The judgments will be reversed and the cases remanded for a new trial in accordance with the alternative order of the district court.
 
 
 
 Notes:
 
 
 [1]
 There is nothing specifically in Bailey's evidence as to whether he actually knew of the distinction Von Ludwig makes between a primary beam and a secondary beam or stringer
 
 
 [2]
 We agree with the district court that not the slightest defect in the manufacture of the beams as such or of the finished product has been shown