Howard SMITH, Plaintiff,

v.

The HOBART MANUFACTURING COMPANY, Defendant and Third-Party Plaintiff, Appellant,

v.

HOLIDAY FROSTED FOOD COMPANY, Third-Party Defendant.

Howard SMITH, Plaintiff,

v.

The HOBART MANUFACTURING COMPANY, Defendant and Third-Party Plaintiff, Appellee,

v.

HOLIDAY FROSTED FOOD COMPANY, Third-Party Defendant, Appellant.

Nos. 13667, 13668.

United States Court of Appeals Third Circuit.

Argued Dec. 4, 1961.

Decided April 30, 1962.

John B. Hannum, III, Philadelphia, Pa. (Victor L. Drexel, Philadelphia, Pa., on the brief), for Hobart Mfg. Co.

Harry A. Short, Jr., Philadelphia, Pa. (John J. McDevitt, 3rd, Philadelphia, Pa., on the brief), for Holiday Frosted Food Co.

Benjamin Kuby, Philadelphia, Pa. (Allen T. Newman, Klovsky & Kuby, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, STALEY and GANEY, Circuit Judges.

GANEY, Circuit Judge.

Howard Smith's right hand became entangled in the revolving worm of an electrically powered meat grinder and was seriously injured as a result of his slipping on a platform while feeding meat to the grinder on May 6, 1957. At the time he was working within the course and scope of his employment in an establishment owned by his employer, Holiday Frosted Food Co. ("Holiday") in Philadelphia, Pennsylvania. He brought an action against The Hobart Manufacturing Company ("Hobart"), the designer and manufacturer of the grinder, on the theory that the machine was defectively designed for the purpose for which it was to be used.[1] The District Court had jurisdiction by virtue of diversity and jurisdictional amount. Hobart joined Holiday as a third-party defendant to the action on the ground that it was negligent in the maintenance and operation of the machine. At a second trial of the action, a jury found Hobart liable to Smith and Holiday liable to Hobart for the injury sustained by him.[2] Each of the motions of Hobart and Holiday for judgment n. o. v. and for a new trial were denied. 194 F.Supp. 530 (E.D.Pa. 1961). Hobart and Holiday have appealed.

On January 22, 1957, Holiday purchased a meat grinder (Model 4542 Chopper) from Hobart to replace a smaller grinder. It was delivered on February 15, 1957, and was placed in Holiday's shipping room and permitted to remain there for about a week. When the machine was delivered by Hobart, a guard was affixed to it over the mouth of the bowl into which meat was fed to be ground. The purpose of the guard was to prevent the hand of an operator of the machine from accidentally entering the mouth of the bowl and touching the worm. The machine was removed from its crate and placed in Holiday's fabricating room where it stayed for approximately six weeks.

---

1. The Hobart Manufacturing Company is a corporation organized under the laws of Ohio with its principal plant in Troy of that State. It has registered to do business in Pennsylvania.

2. The opinion of the trial court giving the reason for awarding the new trial is reported at 185 F.Supp. 751 (E.D.Pa.1960).

Because of the issues raised hereafter, we think a detailed description of the meat grinder is in order here. The machine, weighing between 200 and 300 pounds, had a housing 2 feet long, 1½ feet wide and 2 feet high, which covered the 5 horsepower electric motor, gears and drive shaft. An electric intake cord entered the housing at the lower part of the rear of the housing. The machine itself had only one electric control switch, an off-and-on push button type, centrally located on the side of the housing facing the operator.[3] A two foot long removable metal cylindrically shaped projection, containing the rotary shaft, the worm, perforated cutting disc and rotary knife blade, was attached to the front of the housing 6 inches from the top.[4] On the top of the metal projection, equi-distant from the housing and the cutting end, was an inverted bell-shaped funnel or bowl, 6 inches deep, into which the meat is fed. The opening of the bowl was elliptically shaped, measuring 8½ inches along its major axis (which ran cross-wise to the center line of the drive shaft and worm) and 7¼ inches along its minor axis. The dimensions of the inside of the bowl narrowed down to 5 inches by 4 inches at the level of the worm, where it joined the cylinder. The function of the worm was to both grind the meat and carry it forward toward the disc and rotary blades.[5] A stainless steel grill, ⅛ of an inch thick, was placed over the elliptically shaped opening of the bowl and was held in place between 2 and 2½ inches above the opening of the bowl by three steel legs in tripod fashion. The measurements of the grill along its major and minor axis were 9¾ and 8 inches respectively. The three legs, which both supported and held the grill in place, fitted into pre-bored holes on the rim of the bowl. One was placed at each end of

the major axis, and one at the end of the minor axis furtherest away from the housing. The largest unobstructed opening space between the grill and the rim of the bowl measured 8½ by 2½ inches. Each leg was kept in place by a drive pin which fitted snugly in a pre-bored hole, ⅟₁₆ of an inch in diameter, that penetrated the wall of the bowl and the leg perpendicularly to the center line of the leg. The dome-shaped head drive pins were driven into the holes from the inside of the bowl, but they did not completely come through to the outer surface of the bowl. The grill had seven circular holes 2⅜ inches in diameter; one was centrally located, and six were in a hexagonal pattern. The purpose of the seven holes was to permit the passage of a wooden stomper so that meat could be moved or pushed down into the bowl. At two places on top of the guard or grill was imprinted the following warning:

"KEEP HAND
FROM UNDER GRILL
USE STOMPER"

The grill and legs constituted the guard which, as has been indicated, covered the elliptical opening of the bowl. A removable feeding tray, 40 inches long and 15 inches wide, with an opening in the bottom at one of its ends fitted over the grill and rested flush with the rim of the bowl; its other end rested on the top of the housing. The back rim of the tray was a great deal higher than the front rim immediately in front of the operator, as indicated by Exhibit P–1. Although the record is devoid of the exact measurement, this front rim, when scaled to dimension, measured between 3 and 4 inches in height. This tray was held in place by clamps.

While the meat grinder was in the fabricating room, one of Smith's wit-

---

3. The machine also had a hidden overload thermal relay that automatically cut off the current to the motor when the rotating of the worm was interfered with to prevent damage to the motor.

4. One of the purposes of the removability of the cylinder projection was to facilitate

the cleaning of its parts in water. The manufacturer recommended that they be cleaned daily.

5. When the machine was in operation, the worm rotated at the rate of 225 revolutions per minute.

nesses observed Holiday's plant supervisor, Pete Dambra, take a wrench and hammer and knock the guard off, which operation consumed approximately fifteen minutes. He had removed the guard, not for the purpose of having it repaired or adjusted, or to facilitate the cleaning of the other parts, but in order that larger pieces of meat could be placed in the bowl of the machine and production increased. At the end of the six week period, the meat grinder, minus the guard, was transferred to the Holiday boning room, where meat was dissected and cut into strips or chunks, and placed on a steel table in front of a wooden platform. The electric cord was plugged into an outlet on the left wall about 5 or 6 feet from and to the rear of the machine. The electric current from the outlet could be controlled by a lever switch on the wall 5 feet above the floor.

Smith had previously operated the machine once with the guard in place and twice with the guard removed. On May 6, 1957, after he had completed loading the tray on the meat grinder with chunks and strips of meat and had moved to get the wooden stomper in his left hand, Smith started to push the meat toward the mouth of the bowl with his right hand. As he was doing so, he slipped on the platform and in trying to catch himself, his right hand went down into the bowl and his finger caught in the revolving worm which drew his hand into the machine. Because of the position of his body, he was unable to reach the pushbutton switch to shut off the electric motor and needed assistance to remove what was left of his hand from the bowl. After the accident, the guard was replaced on the machine.

Hobart contends that the refusal of the trial court to set aside the verdict in Smith's favor and to enter judgment in its favor was error because (a) even if the meat grinder were dangerous to operate without the guard, the act of Holiday in deliberately removing the guard was such an extraordinary act of negligence that it should have been ruled as a superseding cause as a matter of law, or (b) the meat grinder with the guard on was reasonably safe for the purpose for which it was to be used.

Hobart does not deny that the grinder was the type of machine which a manufacturer should realize is likely to be dangerous for the use for which it was manufactured unless proper precautions are taken to guard against injury.[6] And Pennsylvania is not adverse to permitting an employee of the buyer or a lessee of an improperly designed chattel to sue the manufacturer for injuries resulting from the defect. Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 28–32, 68 A.2d 517 (1949); Mannsz v. Macwhyte Co., 155 F.2d 445 (3 Cir., 1946); Tohan v. Joseph T. Ryerson and Son, Inc., 265 F.2d 920 (C.A. 3, 1959); Solomon v. White Motor Co., 153 F.Supp. 917 (W.D. Pa.1957). Then Hobart was under a duty to Smith to furnish Holiday with a machine equipped with a suitable guard, that is, one which would protect a reasonably careful operator of the machine. Fegley v. Lycoming Rubber Co., 231 Pa. 446, 80 A. 870 (1911). There is no question that Holiday was negligent in removing the guard. At times a manufacturer, by means of an article made by it, may create a situation which involves an unreasonable risk of harm to another because of the expectable action of a third person.[7]

6. See Restatement, Torts (1934) § 388(a).

7. Section 302(b), Restatement of Torts (1934), states: "A negligent act may be one which: (b) created a situation which involves an unreasonable risk to another because of the expectable action of the other, a third person . . .." Also see comment *m* to this section concerning the anticipation of third person's intentional

misconduct. The section is quoted in Tua v. Brentwood Motor Coach Co., 371 Pa. 570, 573–574, 92 A.2d 209, and in Anderson v. Bushong Pontiac Company, Inc., 404 Pa. 382, 386, 171 A.2d 771, 773 (1961).

Id., Section 290 provides: "For the purpose of determining whether the actor should recognize that his conduct involves

Consequently, in order for Smith to have recovered against Hobart on the basis that the meat grinder was defectively designed when it was delivered to Holiday, it was incumbent upon him to have demonstrated that the machine without the guard was dangerous to operate and either (1) Hobart expected or should have expected that Holiday would have removed the guard and operated the machine without it, or (2) if the guard were in place, it would not have prevented his injury when he slipped.[8]

Hobart does not seriously deny here that the machine with the guard off was dangerous to operate.[9] It is willing to make this concession independently of any violation of a possible applicable state regulation. Did Hobart expect or should it have expected that Holiday would remove the guard and operate the machine without it? The trial court left that question to the jury to decide under the doctrine of foreseeability. We think that a Pennsylvania Court would hold that, on the evidence presented in this case, a trial court should not have left that question for the jury to decide.[10] Comment *m* to § 290 of the Restatement of Torts explains: "While the actor is often entitled to regulate his conduct on the assumption that others will not act wrongfully, he is, with a few exceptions, not entitled to expect that a risk which is

involved in his conduct will be prevented from taking effect in harm to others by the positive action of a third person. And this is true even though the third person is not only able to prevent the harm but under a duty to do so. One of these exceptions exists where the actor turns over land or chattels to another who knowingly assumes control thereof, the actor thereafter having no further interest in its use. In such case the person who assumes control is usually alone responsible, not only for the use to which he puts his land or chattels, but also for his failure to remove any dangerous condition existing when he takes control, unless the actor has *strong reason to expect* the third person to misuse the land or chattels or to fail to remedy the dangerous condition. (see § 302)." (Italics ours.) In our opinion, a Pennsylvania Court would conclude that there was not enough evidence from which the jury could infer that Hobart had reason, let alone strong reason, to expect that Holiday would remove the guard and operate the machine without it. Section 6 of the Safety Act of Pennsylvania[11] prohibited Holiday from removing the guard except for the purpose of making immediate repairs or adjustments. The only evidence that the jury had before it from which it could infer that Hobart should have expected that Holiday would violate the law was the way in which the guard was attached to the rim of the bowl.

---

a risk, he is assumed to know (a) the qualities and habits of human beings and animals and the qualities, characteristics and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community; and (b) the common law, legislative enactments and general customs in so far as they are likely to affect the conduct of the other or third person."

8. This was not solely a defense in the third-party action.

9. Should there be any doubt on this point, see the cases of Fegley v. Lycoming Rubber Co., 231 Pa. 446, 80 A. 870 (1911), and Ralston v. Baldwin Locomotive Works, 240 Pa. 14, 87 A. 299 (1913).

10. For a case in which it was possible for a plaintiff to have adduced evidence

to show that a defendant should have expected the action (i. e., move a newsstand) of a third person, but failed to present sufficient evidence on that score, see Tua v. Brentwood Motor Coach Co., 371 Pa. 570, 92 A.2d 209 (1952), cited in footnote 7, supra.

11. Act of May 18, 1937, P.L. 645, 43 P.S. § 25-6. This section provides: "No person shall remove or make ineffective any safeguard, safety appliance or device attached to machinery except for the purpose of immediately making repairs or adjustments, and any person or persons who remove or make ineffective any such safeguard, safety appliance or device for repairs or adjustments shall replace the same immediately upon completion of such repairs or adjustments."

This was not enough. In Snyder v. Longmead Iron Co., 244 Pa. 325, 90 A. 630 (1914), the guard over cogwheels of machinery owned by defendant had been removed and not replaced. The Court, in holding that the defendant was not negligent and that it had "performed its full duty to plaintiff when it furnished a suitable guard," stated "there was not any evidence sufficient to show a custom prevailing among the men in this establishment of oiling the machinery when in motion, or that it was essential or expedient so to do" and "the defendant had neither actual nor constructive notice of the absence of the guard in question." The Court did not say that there was evidence from which a jury could find that defendant should have expected that the guard would be removed. True, in the case before us, the guard was not welded in place or of the same cast or mold as the bowl. But it could not be removed inadvertently by one in the process of operating the meat grinder; it required tools: a hammer and a wrench and 15 minutes work to separate the guard from the bowl. Hence under the facts shown, Hobart owed no duty to Smith for the injuries resulting from the unanticipated misuse of the grinder.

■ If Hobart had reason to expect that Holiday would remove the guard, the fact that its removal was "wilful or wanton" would not have made that act a superseding cause to Hobart's negligence. See Anderson v. Bushong Pontiac Company, Inc., 404 Pa. 382, 171 A.2d 771, 773 (1961).

■■ The only prop left to support the verdict is Smith's second or alternative ground for recovery, to wit: if the guard were in place it would not have prevented his injuries. However, the trial court did not specifically present the case to the jury on this issue. Of course if there was insufficient evidence on this point, the trial court was correct in not submitting it to the jury for its consideration. Smith was the only eyewitness and narrator of the events immediately leading up to his accident. His testimony as to how the accident happened has been adverted to above. During the process of testifying he demonstrated to the jury how he slipped while he was pushing meat toward the mouth of the bowl. Except in a vague way, we do not know what the movements and angle of his arm were at that time. His demonstration was not described on the record except by his undetailed explanation and the ubiquitous word, "indicating." Smith offered to have the dimensions of his left hand measured before the jury, and to testify that after the accident and the guard had been replaced, he had returned to Holiday's plant and was able to put his left hand under the grill and down into the mouth of the bowl and touch the worm of the meat grinder, but he was prevented from doing so by the trial court. That court also struck out the testimony of Isaac Stewart, a professional engineer called by Smith as an expert witness, who testified that he reached through under the grill on the feed side with an adjustable rule in his hand to measure the dimensions of the bowl and was able to get down to the area of the worm without any difficulty. In addition, the court would not permit Holiday to question another expert witness, Thomas A. Oravecz, Director of the Bureau of Industrial Standards for the Department of Labor & Industry of the Commonwealth of Pennsylvania, and a professional engineer, concerning the fact that he was able to put his hand under the grill on the feed side and touch the worm, and that his hand was larger than Smith's left hand. True, a showing that a man's hand, the size of Smith's, could be intentionally passed through the opening under the grill and touch the worm does not prove that the guard, had it been in place at the time, would not have intercepted or blocked a hand passing unintentionally in a haphazard fashion near the open space under the grill on the feed side. However it does lend some credence to the assertion that Smith's hand could have slipped under the guard. On the other hand the amount of meat in the tray or

the tray's lower rim could have required Smith's hand to be at such a height or at such an angle with the tray that it would be unlikely for his hand to have gotten under the grill at the time of the accident if the guard were in place. But that is a problem for the trial court. We think Smith was prevented from having his day in court on this issue, and in the interest of justice he should be awarded a new trial, limited to the proof that the guard would not have prevented his injuries.[12] Of course Hobart cannot recover against Holiday for contribution on this issue. The only basis upon which it might have obtained a verdict against Holiday was in the event that Smith was permitted to recover against Hobart on the issues that the meat grinder was dangerous to operate without the guard and Hobart expected or should have expected that Holiday would remove it and operate the machine without the guard. Because there was insufficient evidence to prove that issue, Hobart's judgment against Holiday cannot be permitted to stand.

Since Hobart concedes that the machine minus the guard was dangerous to operate, we need not determine whether Rule 4,[13] related to meat grinding, of the Regulations for Miscellaneous Hazards and Conditions of Employment, promulgated by the Pennsylvania Department of Labor and Industry, pursuant to authority of the Safety Act of May 18, 1937, P.L. 654, sometimes referred to as the Factory Act, 43 P.S. § 25–1 et seq., applied to Hobart or not.

Accordingly, the judgment in favor of Smith and against Hobart in the main action will be reversed and the case remanded with directions to order a partial new trial; and the judgment in favor of Hobart and against Holiday in the third-party action will also be reversed and the case remanded for entry of judgment in favor of Holiday against Hobart.

12. See 6 Moore's Fed.Practice (2nd Ed.) Para. 59.06, pp. 3766–67.

13. This Rule provides: "(a) All power-driven meat grinders of the worm type shall be so constructed that meat can be safely fed to the worm by one of the following methods:

"1. By a mechanical method of feeding the worm.

"2. By the use of a permanently attached neck to the cylinder enclosing the worm which shall have an opening of not more than 2½ inches in diameter at a point at least 4½ inches above the worm.

"3. Other means of protection may be provided when approved by the Industrial Board.

Approved January 12, 1927"