Edna S. GOLDSMITH, Thomas A. Goldsmith, II, Infant by Edna S. Goldsmith, his mother and next friend, James M. De Vinne, Administrator of the Estate of Thomas R. Goldsmith, deceased, and Norbert B. Bowers, Administrator of the Estate of George M. Bowers, deceased, and E. Rosalie Tygert, individually, and as Administrator of the Estate of Donald W. Tygert, deceased; Ben J. Bowers; Patricia Keaton; William Thompson; Conger, Infant by Patricia Keaton, his mother and next friend; and Thomas C. Ward, Administrator of the Estate of William T. Conger, deceased

v.

MARTIN MARIETTA CORPORATION
and
The Bendix Corporation (a Delaware corporation).
Civ. No. 12653.

United States District Court
D. Maryland.
Nov. 9, 1962.

Daniel I. Sherry, Washington, D. C., Harvey Rosenberg and Claude B. Kahn, Bethesda, Md. (James M. De Vinne, Cleveland, Ohio, and Vilas M. Swan, Rochester, N. Y., of counsel), for plaintiffs.

Benjamin C. Howard, Baltimore, Md., for defendant Martin Marietta Corp.

Norwood B. Orrick, Baltimore, Md., for defendant Bendix Corp.

NORTHROP, District Judge.

This action arises out of the deaths of the pilot and three other crew members of a scheduled passenger airliner which, on December 1, 1959, crashed on Bald Eagle Mountain near Williamsport, Pennsylvania. The plane was an Allegheny Airlines Martin 202, No. N–174A, and all of her passengers, except one, were killed. A motion for summary judgment made on behalf of the Martin Marietta Corporation was granted on May 7, 1962, because of the plaintiffs' failure—in the face of their own admissions—to establish either negligence or proximate cause. Now to be considered is the motion for summary judgment made on behalf of the sole remaining defendant, The Bendix Corporation.

## I

Although the plaintiffs' Second Amended Complaint is quite lengthy, the allegations therein concerning the liability of Bendix are succinctly stated as follows:

"4. Certain of the navigational instruments contained in said aircraft, including an instrument known as the fluxgate compass and the fluxgate compass caging switch, were designed and manufactured by Defendant The Bendix Corporation. The fluxgate compass system was not part of the original equipment but was installed by parties unknown to plaintiffs sometime after the aircraft had been manufactured by The Martin Company. The repeater direction indicators for this sytem were installed on the instrument panels. The control was installed at the same location as the automatic pilot pedestal controller. The caging switch was designed and manufactured without a guard.

"5. * * *

"The negligence of The Bendix Company consisted of designing and manufacturing the fluxgate caging switch without a guard.

"Because of the negligence of the defendants in the design and manufacture of the aforesaid * * * instruments, the aircraft crashed and the death of the aforenamed decedents resulted therefrom, when the aircraft went off course as the result of the inadvertent and unknowing actuation of the unguarded fluxgate compass caging switch. This caused the repeater directional indicators to give improper readings. This was not readily ascertainable to the crew because of the overhead location of the standby compass."

Thus, the action against Bendix is based solely upon negligence relating to its design and manufacture of the Flux Gate compass system.

This system is an ingenious mechanism which enables the navigators of aircraft to obtain correct directional information, undistorted either by the magnetic influences of the aircraft or by the position of the aircraft relative to the earth's surface. The Flux Gate itself is simply a triangular-shaped electronic core, but it is the heart of the entire system. Accurate compass readings are given only when this triangle is parallel to the horizontal component of the earth's magnetic field. To keep the Flux Gate in this position, irrespective of the plane's maneuvering, it is mounted perpendicular to a vertical-seeking gyro. Actuation of the Flux Gate compass caging switch commences a cycle in which the gyro is erected to a position vertical to the aircraft. However, in order for the gyro correctly to set the Flux Gate, this erection cycle must take place when the gyro will reach a position not only vertical to the plane, as it always does, but also

vertical to the earth's surface. That is, when the gyro is erected, the plane should be either in level flight or at rest on level ground. Generally speaking, if the gyro were erected when the plane was in a bank, for instance, the readings given by the compass would be inaccurate. However, these inaccuracies would exist only temporarily. If the plane is not level during the erection cycle (as, indeed, it would not be when on the ground), a rolling-ball type mechanism automatically continues to raise the gyro until it is vertical with respect to the earth, regardless of the plane's position.

It is the plaintiffs' contention that the unguarded caging switch—which, actually, is a button—was inadvertently and unknowingly activated while the plane was in a bank preparatory to landing at the airport in Williamsport. This is claimed to have caused incorrect positioning of the gyro and Flux Gate with consequent temporarily incorrect directional information, which was relied upon by the crew during the course of the plane's fateful instrument landing. Bendix denies that this is how the accident occurred; but, for the purposes of the present motion, this set of facts may be assumed to be correct and undisputed.[1]

It is to be noted that the sole act of negligence which the plaintiffs assign to Bendix is the design and manufacture of the caging switch without a guard. It is not contended that any element of the compass system functioned improperly. The plaintiffs merely urge that the button should have been protected by means of a metal cylinder embracing it, or by some other type of guard.[2]

Bendix admits that it designed, manufactured, and supplied all of the elements of the Flux Gate compass system aboard the aircraft when it crashed, except the caging switch. Who installed the entire system and when it was installed are unknown. It was not in the plane when delivered by Martin in 1947, and the plane passed through a succession of owners prior to the accident.

It is undisputed that the caging switch unit aboard the aircraft was not manufactured, supplied or installed by Bendix. Bendix ceased manufacturing such a unit sometime prior to August 1950 because all of its components were readily available from other manufacturers of electrical equipment. However, the caging switch unit previously manufactured by Bendix did not have a guard protecting the button from accidental actuation, just as the unit in the aircraft did not.

It is the plaintiffs' contention that the caging switch in the aircraft was constructed by reference to the plans and designs of Bendix.[3] If the plans were

---

1. The court is well aware that this assumption gives the appearance that the motion under consideration is one to dismiss for failure to state a claim upon which relief can be granted, rather than a motion for summary judgment. However, the distinction between the two motions often is one without substance. See Rule 12(b), F.R.Civ.P. There are a great many alleged facts which actually are in dispute, but because of Bendix's contention that this dispute is of no consequence, all genuine disputes have been resolved in favor of the plaintiffs for the purpose only of deciding the pending motion. The motion was not made under Rule 12(b) because of the plaintiffs' allegation that Bendix manufactured the switch in question.

2. It might be observed at this point that the plaintiffs' allegations are suggestive of the tale about the loss of a kingdom for want of a nail with which to shoe a horse.

3. Specifically, it is claimed that the button incorporated into the housing placed in the aircraft was identical to that used in the Bendix unit. Although we may assume this fact to be fairly established by the plaintiffs' affidavits, it is of little consequence, for the plaintiffs' action is based upon the absence of a guard on the button's housing, not upon any defect in the button itself. That the button used in the Bendix unit and the one in the unit aboard the plane were identical and any other similarities between the two units merely go to support the plaintiffs' position that whoever constructed the unit in the plane did so by consulting the design of the Bendix unit. We are assuming this to be established.

available to whoever constructed and installed the switch, they were contained in an installation, operation and maintenance manual which, on its very cover, indicated that it was not provided for that purpose. Although nothing in the record suggests that Bendix had specific knowledge of the use of its plans in constructing this particular switch, it nonetheless is fair to infer that Bendix reasonably could have anticipated that its plans would be consulted in the construction of some switches. In many instances prior to August 1950, and in all instances thereafter, Bendix sold its compass system without a switch. A switch was essential to the system and, as recently as 1957, the Bendix maintenance manual contained a photograph and dimensional drawing of such a switch— a button-type switch with the button unprotected by a guard. A purchaser of the Bendix compass system, in constructing the necessary switch, could refer to and follow completely the Bendix design, or could refer to and modify the Bendix design, or could produce a switch according to his own design. In the instant case, the unknown builder apparently pursued the second alternative. While the two units are markedly dissimilar in size, shape, means of construction and arrangement of elements, their respective buttons, telltale lamps and instruction plates are very much alike.[4] But, regardless of which course of action was

pursued, Bendix would have had no measure of control over the situation, beyond striking the photograph and drawing from any manual provided to the purchaser of its system without the caging switch.

## II

The plaintiffs contend that a recovery may be had against one who negligently designs an item, even though the item is subsequently manufactured by one other than the designer. In the abstract, this proposition does not seem unsound, and it requires but little imagination to state a situation in which liability might be predicated upon negligent design and nothing more.[5] The question is whether this is such a case.

For the moment, we shall assume that Bendix was negligent in failing to include a guard in its design of the switch. We also shall assume that Bendix could have foreseen the use of its design, the inadvertent actuation of the switch, and all of the possible attendant consequences.[6] Yet it is impossible to escape the conclusion that there were at least two independent intervening acts of negligence between that of Bendix and the crash of the aircraft.

First, if it was negligent of Bendix to design the switch without a guard, it was no less negligent for some unknown person to construct it without a guard. Such an inference is altogether warranted.

4. Of course, the vast dissimilarities between the two units, despite their obvious similarities, place considerable strain upon the plaintiffs' assertion that Bendix designed the unit in the airplane. Under the undisputable facts, this contention approaches the obvious absurdity of a statement such as: the Wright brothers designed the Allegheny Airlines' Martin 202. Of necessity, the mechanical principle of the operation of the two units was the same because they both had to perform the same function. However, despite the probable imprecision of the plaintiffs' assertion, the within discussion proceeds on the assumption that it is accurate.

5. The situation which most readily comes to mind is that of the manufacturer of

unassembled electronic equipment who sells this equipment in a construction kit, together with detailed circuit diagrams and instructions, to a hi-fi enthusiast. What if a diagram for an amplifier were defective, the diagram were explicitly followed, the do-it-yourself purchaser put the unit's plug in an electric outlet, and the unit exploded?

6. Although this assumption is being made, it is highly questionable that these matters were foreseeable within legal contemplation. Smith v. Hobart Manufacturing Co., 302 F.2d 570 (3rd Cir. 1962); Scurfield v. Federal Laboratories, Inc., 335 Pa. 145, 6 A.2d 559 (1939). See discussion below.

Assuming the Bendix manual was consulted by whoever constructed the caging switch in the plane,[7] it is undisputed that it contained two warnings, among others. It warned against the navigational hazards created by incorrect positioning of the Flux Gate, and it further warned that such incorrect positioning could result from accidental operation of the caging button. In the light of these dangers, the manual went on to suggest that the switch box should be located where the likelihood of accidental operation would be minimal.[8] Thus, the dangers of an unguarded switch were apparent to Bendix and conveyed by it, in its manual, to the purchasers of its system. In the instant case, the Bendix design was not followed slavishly, so the builder of the switch must have had considerable mechanical skills. He easily could have devised a guard that would have protected against the danger of accidental actuation.

Second, if the switch were actuated as the plaintiffs contend, whoever did so or permitted such to be done likewise was negligent. Peculiarly, the plaintiffs have disputed this in their memoranda submitted to the court. But their entire case is necessarily predicated upon the specific assumption that the button was carelessly actuated when the plane was in a bank. Clearly, if the button had been intentionally depressed by one of the crew members (which, parenthetically, would have been no less an act of negligence than if it were depressed inadvertently), the presence or absence of a guard would have been of no consequence whatever.

The conclusion that these two independent acts of negligence [9] succeeded that of Bendix is bolstered by the fact that the dangers of an unguarded switch and accidental operation were so very patent. The plaintiffs dispute this, but we do not believe that the dispute is genuine. First, the existence of these dangers was conveyed in the maintenance manual. Second, the plaintiffs themselves must rely upon the fact that the dangers were obvious. To negate circumstantially the inference that the caging button was intentionally depressed, they would be compelled to demonstrate that no pilot nor anyone else familiar with the Flux Gate compass system would commence an erecting cycle of the gyro when the plane was in a bank. The danger of accidental actuation of the caging button must have been as obvious to the crew members of the plane as is the danger of driving an automobile without headlights on an unlighted road at night to an average layman.

### III

The question then presents itself: Is the mere designer of an item, who can foresee the obvious danger of negligent use and who warns against same, liable for failing to provide in his design a safety device to protect against such negligence? In this case, we think not.

██ Closely bound up in this answer is the doctrine of legal or proximate cause and a consideration of that doctrine as a means of limiting liability. Under the law of Pennsylvania, where a second tort-feasor has become aware of the danger created by an original tort-feasor and nonetheless thereafter brings about an accident by his own independent act, the original tort-feasor is relieved of all liability. This is so because the condition created by the original tort-feasor is deemed to be but a circumstance of the accident and not its proximate cause;

7. Of course, if the manual was not consulted, there would be a complete absence of any causal connection between the alleged negligence of Bendix and the fatal accident.

8. Bendix contends that this warning was not heeded, but there is a genuine dispute between the parties as to this. For the purposes of this discussion, the dispute shall be resolved in favor of the plaintiffs.

9. There quite possibly was a third act of negligence. Because of the presence of additional directional equipment aboard the aircraft, it very well may have been negligent of its navigators to have failed to notice and correct any discrepancies between the directional information given by the Flux Gate compass and this other equipment. However, the validity of this inference is somewhat questionable, so no weight has been attached to it.

the act of the first wrongdoer is considered as entirely superseded by that of the second wrongdoer. The cases so holding are legion. Brazel v. McMurray, 404 Pa. 188, 171 A.2d 151 (1961); Jeloszewski v. Sloan, 375 Pa. 360, 100 A.2d 480 (1953); Ritter v. Olson, 363 Pa. 40, 68 A.2d 732 (1949); and Kline v. Moyer, 325 Pa. 357, 191 A. 43, 111 A.L.R. 406 (1937). That these cases do not involve products liability is of little significance, for the concept of proximate cause is equally pertinent here as it is in the run-of-the-mill negligence cases.[10]

The instant case seems controlled by the decision of the Third Circuit in Hopkins v. E. I. DuPont De Nemours & Co., 212 F.2d 623 (3rd Cir. 1954), certiorari denied 348 U.S. 872, 75 S.Ct. 108, 99 L. Ed. 686, which arose under the law of Pennsylvania. The case involved the death of a highway construction worker as the result of a premature explosion of dynamite. The defendant corporation was the manufacturer of dynamite, and it had failed to apprise its purchasers of the danger created by loading dynamite into a recently bored hole before the heat of the boring had dissipated. The court stated:

> "Admittedly, the dynamite was not defective. Thus, the situation was one which frequently arises in negligence cases of various types where the plaintiff must show a known or foreseeable hazard against which the defendant should have guarded, by warning *or otherwise,* but did not. * * * But to establish liability for failure to give a warning, plaintiff also had to prove that the user, of the dynamite, in this case a contractor represented on the job by a blasting foreman, would not and did not have adequate information about the increased hazard which in the opinion of plaintiff's expert existed when the hole was loaded. * * * [T]he defendant cannot be held li-

able if this accident was caused by disregard of the heat hazard thus known to have been incidental to drilling in hard rock." 212 F.2d 623, at pp. 625–626 [emphasis supplied]

Thus, after finding that the blasting foreman knew of the danger of which the manufacturer had failed to give notice, the court concluded that the manufacturer could not be held liable. This denial of recovery elsewhere erroneously has been assumed to have been predicated upon a finding of contributory negligence. 1 Hursh, American Law of Products Liability, § 2:52, at pp. 232–234 (1961). However, there was no evidence that the plaintiff's decedent knew of the danger of loading boreholes when they were still hot; the court held only that the deceased's foreman, and not the deceased himself, knew of such danger. Because the foreman did know of the danger and, in the face of this knowledge, nonetheless failed to take reasonable precautions, the manufacturer was exonerated. But this is not to say that the manufacturer was found not to have been negligent. To the contrary, the manufacturer was presumed to have been negligent, but this negligence was deemed to have been superseded by that of the foreman. This is precisely the situation in the instant case. Bendix is to be exonerated, not because it was not negligent, but because its negligence, if any, was superseded by that of the persons who constructed the switch and who actuated it.

■■ The court recognizes that, under the law of Pennsylvania, there are instances in which the intervening negligence of one wrongdoer is not held to supersede the negligence of an original wrongdoer. Anderson v. Bushong Pontiac Co., Inc., 404 Pa. 382, 171 A.2d 771 (1961). Specifically, in the area of products liability, it has been pointed out that one whose product creates an unreasonable risk of harm still may be subject to liability, even if that harm were inflicted

10. Of course, the principle here stated is akin to that of "last clear chance" so frequently encountered in automobile cases. Regardless of the principle's most readily recognizable name or its most frequent application, it remains simply a rule governing the establishment of proximate cause.

by the intervening negligence of another; but the intervening negligence is considered *not* to supersede the original negligence if, and only if, that intervening negligence were foreseeable. 2 Harper and James, The Law of Torts, § 28.10 (1956). One of the requisites for the application of this proposition is that the design create an unreasonable risk of harm; this, for reasons momentarily to be stated, we do not believe to be present in the instant case. The second requisite is that the intervening act of negligence must be foreseeable. In the language of the Restatement (Torts, § 290, comment m), the intervening negligence does not supersede that of the original wrongdoer, "unless the actor [original wrongdoer] has strong reason to expect the third person [second wrongdoer] to misuse the land or chattels or to fail to remedy the dangerous condition." In our opinion, a Pennsylvania court would conclude, as a matter of law, that Bendix did not have *strong reason* to expect and anticipate the peculiar configuration of all of the circumstances alleged by the plaintiffs to have conspired to produce the losses complained of: (1) that the Bendix design would be pirated; (2) that the pirating would result in the construction of a switch without a guard; (3) that the switch would be actuated negligently while the plane was in a bank and during the course of an instrument landing; (4) that this negligent actuation would go unnoticed; (5) that the temporarily incorrect directional information thereby given would be relied upon; and (6) that reliance upon this information would produce a crash. The only evidence adducible by the plaintiffs to establish that these or similar events were foreseen by Bendix is the mere general recognition of the possibility of accidental actuation in the Bendix manual. This is not enough. See Smith v. Hobart Manufacturing Co., 302 F.2d 570 (3rd Cir. 1962), applying Pennsylvania law; Scurfield v. Federal Laboratories, Inc., 335 Pa. 145, 6 A.2d 559 (1939).

## IV

The above discussion of proximate cause is based upon the assumption that Bendix had a duty to include a guard in its design of the Flux Gate compass caging switch and that this duty was breached; in short, we have assumed thus far that Bendix was negligent. However, the defendant urges that a designer, be he a manufacturer or not, is under no duty to provide safeguards against hazards which are obvious. Principally relied upon for this proposition is the leading case of Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950), which broadly states that a manufacturer "is under no duty to guard against injury from a patent peril or from a source manifestly dangerous."

This decision has been criticized, among other reasons, because "[a] peril or danger may be patent but still not appreciated." 1 Frumer and Friedman, Products Liability, § 7.02, at p. 114 (1960). See the dissent of Clark, C. J., in Messina v. Clark Equipment Co., 263 F.2d 291 (2nd Cir., 1959); and Noel, "Manufacturer's Negligence of Design or Directions for Use of a Product", 71 Yale L.J. 816, 837–841 (1962). In the instant case, the criticism is not apt. We need not doubt that the danger created by the absence of a guard on the caging switch was patent, and the plaintiffs are not in a position to prove that this danger was not appreciated. Those in charge of the aircraft were qualified men who, it is only sensible to infer, were fully aware of all of the hazards presented by the operation of their equipment.

Perhaps a more serious criticism directed against the latent-patent distinction established by the Campo case is that it beclouds a question which is far more material, namely: Did the absence of the safety device create a risk that was unreasonable? Noel, supra, at p. 838. The criticism seems valid, for even obvious dangers that are fully appreciated still

may be unreasonable and unavoidable.[11] Typically, the question of whether the risk created was reasonable or unreasonable would be one for the jury. Here, however, the answer is clear. The absence of a guard on the caging switch was no more unreasonable than would be the absence of a guard on the ignition switch or door handle of an automobile. Thus, we are prepared to say, as a matter of law, that the absence of a guard on the caging switch did not create any unreasonable risks.

While there is an ever increasing tendency to hold a designer liable for the failure to include a safety device in his product, even where the danger to be protected against is obvious, Pennsylvania does not appear to have yet gone this far. Muller v. A. B. Kirschbaum Co., 298 Pa. 560, 148 A. 851 (1930), has not been enlarged upon. Furthermore, the few decisions imposing liability for failing to guard against obvious dangers merely signal expanding concepts of negligence and not of proximate cause.

■ There is one final reason why, in this case, we are loath to admit the possibility that Bendix was negligent: *The design of the caging switch, in fact, did include a guard.* To be sure, it was not the type of guard to the absence of which the plaintiffs complain. It did not guard against negligent actuation of the switch; rather, it gave warning of the occurrence of such negligence. We are referring, of course, to the inclusion of a telltale lamp in the Bendix design of its switch. Upon depression of the caging button, this telltale lamp lit up, and it remained on until the caging cycle was completed. Such a lamp was incorporated into the switch aboard the airliner, and it has been estimated that the lamp would remain lit, after actuation of the button, for somewhere between five and fifteen seconds. We are of the opinion that the inclusion of this telltale lamp in the Bendix design wholly undermines the plaintiffs' theory of recovery.

## V

The instant case has been pending before this court for two years. The pleadings are elaborate, and the discovery has been both extensive and costly. Yet, despite all this, the plaintiffs' claims and theories remain as speculative and ephemeral as they were at the time suit first was filed.

The plaintiffs do not know who constructed and installed the caging switch aboard the aircraft. They do not know when this was done or under what circumstances it was done. Of these matters, the plaintiffs have no proof. The plaintiffs are not even able to hypothesize, let alone prove, a situation in which whoever constructed the caging switch did so in the exercise of due care—assuming that Bendix did not exercise due care in the design of the switch. The plaintiffs are incapable of proving that the dangers of an unguarded switch were other than obvious. The plaintiffs cannot prove that the caging switch actually was actuated just prior to the crash or, if it was, that the erroneous directional information thereby given actually was relied upon.

In summation, the plaintiffs have adduced no affirmative evidence that is consistent with the imposition of liability upon Bendix. The very most that they have established is the mere likelihood that whoever constructed the caging switch did so by referring to Bendix's design. This hardly is sufficient to establish liability and is equally insufficient to withstand a motion for summary judgment.

We refuse to saddle Bendix with the burden and expense of a prolonged trial on the plaintiffs' vague supposition that something in their favor may turn up. Their claim is too speculative; their

11. For instance, it might create an unreasonable risk, regardless of its appreciation by the user, to manufacture sticks of dynamite with very short and quick fuses. However, this example and others like it suggest problems with respect to assumption of risk and contributory negligence. The relevancy of these problems would depend, in any given suit, upon who was the party plaintiff.

proof, too scant. See cases and commentary at 6 Moore's Federal Practice, ¶ 56.15 [5], at pp. 2144–2154 (2nd ed. 1953).

## CONCLUSION

For the reasons stated above, the motion for summary judgment must be granted and judgment entered in favor of the defendant, The Bendix Corporation. Counsel for the defendant is instructed to prepare and submit the appropriate order.