JOSE FRANCISCO CEPEDA, AN INFANT, BY HIS GUARD-
IAN *AD LITEM*, VICTORIA CEPEDA, PLAINTIFF-AP-
PELLANT, v. CUMBERLAND ENGINEERING COMPANY,
INC., DEFENDANT-RESPONDENT.

Argued February 23, 1977—Decided April 26, 1978.

154

156

*Mr. Mark D. Larner* argued the cause for plaintiff-appellant (*Messrs. Budd, Larner, Kent, Gross, Picillo & Rosenbaum,* attorneys).

*Mr. Edward R. Schwartz* argued the cause for defendant-respondent (*Messrs. Schwartz and Andolino,* attorneys; *Mr. Frank R. Cinquina,* on the brief).

The opinion of the court was delivered by
CONFORD, P. J. A. D. (temporarily assigned).

### I

We granted certification, 70 *N. J.* 274 (1976), to review a decision of the Appellate Division, 138 *N. J. Super.* 344 (1976), reversing a judgment entered on a jury verdict for plaintiff in the Law Division and directing entry of judgment in favor of defendant. The action, brought by a workman operating a "pelletizing" machine, was for negligence and breach of warranty against the manufacturer of the machine, for damages consequent upon the loss of four fingers of the left hand resulting from an accident in the course of such operation in 1968. Although the machine came from the manufacturer with a bolted guard which

would have prevented the accident, the guard had apparently been removed before plaintiff came to work on the day of the accident.

The theory of plaintiff's action was that the machine was defectively designed from a safety standpoint, in that the guard was required to be removed frequently in the normal course of the operation of the machine; that it could have been expected that on some such occasion the guard would not be replaced before resumption of operations, whether inadvertently or otherwise; and that therefore the defendant manufacturer should have equipped it with an electronic "interlock" mechanism, readily available and capable of installation, which would have automatically prevented the operation of the machine when the guard was off. The defense was that the machine was not defectively designed as it met general standards of safety as of the date of its sale to plaintiff's employer, 1956, and as it was reasonably contemplated that the machine would not be operated with the guard off. It was further contended that plaintiff was guilty of contributory negligence in operating the machine with the guard off and that such negligence barred recovery, being a substantial factor in bringing about the accident.

At the trial the court denied motions by defendant for dismissal before submission of the case to the jury. It submitted the issue of defendant's liability on the theory of strict liability in tort, framing the question both in terms of *A. L. I. Restatement, Torts, 2d, Section* 402A (1965) (*"Rest. 2d* Sec. 402A," hereinafter), *i.e.,* whether the machine as sold was "defective" because "unreasonably dangerous" to the user, and of implied warranty, *i.e.,* whether it was defective because "not reasonably fit for the ordinary purpose for which such products are sold and used." The issue of contributory negligence was framed to the jury both under the standard formulation appropriate to an ordinary negligence case ("that degree of care for one's own safety which a person of ordinary prudence would exercise under similar circumstances") and that generally following *Rest.*

2d Sec. 402A, Comment n, *i.e.*, whether plaintiff "voluntarily and unreasonably proceeded to encounter a danger which was known to him."

The court required the jury to respond to four interrogatories: (1) whether the machine was defective in design when sold; (2) whether, in event of an affirmative response to (1), the defect was the proximate cause of the accident; (3) whether plaintiff was contributorily negligent in operating the machine; (4) whether, in event of an affirmative response to (3), such contributory negligence was a proximate cause of the accident; (5) the amount of damages awarded if (1) and (2) were answered affirmatively and either (3) or (4) were answered in the negative. In its verdict the jury answered questions (1), (2) and (3) in the affirmative and (4) in the negative. It awarded plaintiff $125,000 damages, for which judgment was entered against defendant.

The defendant moved for a judgment n.o.v or for a new trial. One of the grounds for the latter motion was the inconsistency of the answers to questions (3) and (4). The trial court denied the motion. As to the latter ground, the court was of the view that the jury could on the evidence have found plaintiff contributorily negligent but such contributory negligence not a "substantial factor" in bringing about the accident and therefore not a proximate cause thereof.

The Appellate Division found that the evidence compelled the conclusion as a matter of law that the machine as delivered was free of design defect. The manufacturer was "entitled to expect normal use" of its product, and if a safety device provided with the machine was not used, the manufacturer "cannot be held responsible for unforeseeable negligence on the part of third parties in operating or permitting operation of the equipment without the device." 138 *N. J. Super.* at 351. The court did not find it necessary to reach other grounds of appeal raised by defendant.

We have concluded that the Appellate Division did not, as it was required to do, give the plaintiff the benefit of all the proofs and of all legitimate inferences therefrom favorable to plaintiff, before deciding the fact-issues in the case against him as a matter of law; see *Shellhammer v. Lehigh Valley Railroad Co.*, 14 *N. J.* 341, 345 (1954). As will appear, the best view of the evidence from the plaintiff's standpoint would permit an inference that it was indeed foreseeable that in view of the frequent occasion for removal of the guard during operations someone would permit the plaintiff to use the machine without the guard or that he would do so ignorantly or inadvertently. In such circumstances, moreover, authoritative interpretation of *Rest. 2d* Sec. 402A, to which provisions this Court has broadly committed itself in this area, see cases cited *infra*, justifies our adopting the rule that knowledge of the dangerous potentiality of a machine design as reflected by the evidence at trial is imputable to the manufacturer, and that the remaining determinative question as to affirmative liability is whether a reasonably prudent manufacturer with such foreknowledge would have put such a product into the stream of commerce after considering the hazards as well as the utility of the machine, the ease of incorporating a remedial interlock, the likelihood *vel non* that the machine would be used only with the guard, and such other factors as would bear upon the prudence of a reasonable manufacturer in so deciding whether to market the machine. Wade,[1] "Strict Tort Liability of Manufacturers," 19 *S. W. L. J.* 5, 15, 17 (1965); Wade, "On The Nature Of Strict Tort Liability For Products," 44 *Miss. L. J.* 825, 834–835, 837–838, 840 (1973); P. Keeton,[2] "Manufacturer's Liability: The Mean-

[1]Dean John W. Wade of Vanderbilt University Law School has been the A. L. I. Reporter of *Restatement, Torts* 2d, since 1970 and was a member of the Advisory Committee thereof previously.

[2]Dean Page Keeton of University of Texas School of Law is and has long been a member of the Advisory Committee of *Restatement, Torts* 2d.

ing Of 'Defect' In The Manufacture And Design Of Products," 20 *Syracuse L. Rev.* 559, 568 (1969) ; P. Keeton, "Product Liability And The Meaning Of Defect," 5 *St. Mary's L. J.* 30, 37–38 (1973) ; Note, 10 *U. S. F. L. Rev.* 492, 519 (1976). Application of that principle, as we shall demonstrate, required submission of the question of the liability of the manufacturer to the jury on the evidence here adduced.

While we have also concluded that an issue of contributory negligence in the special sense of voluntary unreasonable assumption by plaintiff of a known hazard was also properly for the jury, the inconsistency of the jury's findings of contributory negligence and absence of proximate cause between such negligence and the accident, on the factual record before us, will require a new trial on the issue of contributory negligence.

## II

The evidence in the case, taking the most favorable view of the proofs for the plaintiff which could have been entertained by a jury, is as follows.

Plaintiff was an 18 year old native of Santo Domingo who spoke and read no English, had had little schooling, and had worked for the employer, Rotuba Extruders, for eight months when this accident occurred on April 3, 1968. His foremen were Spanish-speaking, as was he. His duties included working on this machine, among other things. At the time, the plant was on a multi-shift operation, and plaintiff's shift was from midnight to 8:00 A.M.

The function of the machine was to draw multiple strands of plastic extruded by another machine into position for cutting into very small pellets, so that the product could be conveniently stored and shipped. When the guard was on the machine, the strands were introduced by the workman into the machine through a horizontal opening in the guard adjoining the table, too narrow to admit a man's hand. However, there was no functional bar to the effectuation of

the process in the absence of the guard (plaintiff had worked the machine without the guard several hours on April 3, 1968 before the accident). The strands of plastic were then sucked up by the "nip-point" of two revolving rollers and carried to a rotating drum containing knives which cut the plastic into pellets. Thence the pellets were discharged into a chute.

Although defendant offered testimony to the effect that in addition to its function of protecting the hands of workers the guard was also designed (1) to aid production as a control over the direction in which the strands were fed to the rollers and (2) to contain stray pellets which might bounce out of the machine, the jury could have concluded that the latter purposes were relatively inconsequential and that the only real function of the guard was, as defendant's vice-president denominated it, as a "finger guard."

Plaintiff testified through an interpreter, and a reading of the transcript renders it probable that either he misunderstood some of the questions or that the translations of his answers thereto were inaccurate or incomplete. He apparently testified in answer to successive questions that prior to the day of the accident he both had, and had not, worked the machine without the guard. The guard was not on the machine when he came to work the night of the accident. He had not taken it off and did not know who had. The accident happened when the "ribbon" of plastic "caught" his hand and "pulled it inside" [the rollers]. He said it "sucked [him] right in." When he was instructed in the use of the machine the guard was on, but he was never told of and did not realize its purpose until after the accident. He was never instructed that he was not to operate the machine if the guard was off. Asked whether the guard was ever off the machine before the night of the accident, he responded, "Why, sure." But he also said he had never operated the machine previously without the guard. He cleaned the machine with an air hose while the guard remained on.

One of plaintiff's supervising foremen testified on depositions *de bene esse* that he told him never to remove the guard from the machine because "the machine could take his hand and whole arm off." Plaintiff himself admitted on depositions that he knew "the rollers could take his hand."

Called as a witness for plaintiff, an officer and plant manager of the employer company testified that there were two types of situations wherein the guard had to be removed for thorough cleaning of the machine. One was when there was to be a drastic change in the color run of the plastic; the other, when the strands jammed the rollers. In either of these situations, "which happened from time to time," the guard had to be dismantled and the inside of the machine both blown out with air and cleaned of the clogging plastic with shears and other tools. There was evidence that it required only a few minutes to remove or install the guard. Operators of the machine were classified as unskilled. To the witness's knowledge, the machine was never operated without the guard.

A plant supervisor corroborated the foregoing testimony as to occasions for removal of the guard. There were times when changes in the color run would occur four times in one shift. Although no one was supposed to run the machine without the guard, the supervisor himself had once "caught his hand" in the machine. The circumstances of that event were not further developed. Only the foremen had the authority and tools to remove the guard.

Isaac Stewart, a consulting engineer for many years in "accident and material failure evaluation," testified for plaintiff to an opinion that when sold in 1956 the machine was "unsafely designed." This was for the reason that the necessity for removal of the guard for cleaning and unclogging the machine was of an "operational" nature rather than for maintenance purposes only. Operational removals mandated an interlock mechanism to prevent operability when the guard was off. An interlock could have been in-

stalled for $25 or $30. Such devices have been known since the turn of the century and were specified in many safety codes 50 years ago. An in-running nip roller is dangerous. As of 1956, machines of various types with "nip" rollers were guarded with interlocks. The witness mentioned examples of such use on machines in the printing, food, injection mold and plastic industries.

Defendant's vice-president, who was a design engineer of the company when this machine was manufactured, testified that the company manufactured many kinds of machines equipped with guards to protect workers, but none were equipped with interlock devices. In 1956 there were no industry safety standards for manufacturing pelletizers. It was not felt necessary to provide an interlock in view of the presence of a guard which was bolted and served an operational as well as a safety function. Interlocks were used only with hinged guards, not bolted ones requiring use of a wrench to remove them, such as that here involved. On cross-examination the witness conceded that interlocks had been known for a long time prior to 1956.

· Seymour Bodner testified as a safety expert for defendant. His opinion that the machine met safety standards was premised on the factual assumption that the guards required removal only on "major cleanups" of the machine and that those were infrequent. He thought that "the operation of the machine without the guard [was] not to be anticipated." General industry safety codes as of 1956 did not call for interlocks on guards. Interlocks can be rendered inoperative. On cross-examination, he conceded that if the guard had to be removed frequently there should have been an interlock.

## III

The development in this State of the doctrine of strict liability in tort of suppliers of chattels for personal injuries sustained by users thereof in consequence of defects in such articles was succinctly summarized by Justice Hall for this

Court in *Heavner v. Uniroyal, Inc.,* 63 *N. J.* 130, 146–152 (1973), and needs no retelling here. As there pointed out, the movement from negligence and warranty theories to that of strict liability in tort, and the ultimate dominance of the latter principle for most purposes, was crystallized in *Rest.* 2d Sec. 402A, which, although not published until 1965, was in process of development by the American Law Institute for some time theretofore.[3] See Wade, *op. cit., supra,* 44 *Miss. L. J.* at 829–831. The section reads as follows:

§ 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) The seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

To the section are appended seventeen "comments," not all of which are followed by all of the many courts which

---

[3]This section is to be distinguished from *Restatement, Torts, 2d, Sec.* 398. That declares liability for a chattel whose design renders it "dangerous for the uses for which it is manufactured" where reasonable care in adoption of a safe design has not been exercised by the manufacturer. Liability thereunder, as distinguished from the strict liability of Sec. 402A, is expressly based upon negligence. See *Pike v. Frank G. Hough Company,* 2 *Cal.* 3d 465, 85 *Cal. Rptr.* 629, 467 *P.* 2d 229, 232 (Sup. Ct. 1970) ; Noel, "Manufacturer's Negligence Of Design Or Directions For Use Of A Product," 71 *Yale L. J.* 816 (1962).

In the present case there was a count in the complaint for negligence but the case was submitted to the jury solely on strict liability in tort.

have adopted the section in principle. In this State, *Rest.*
*2d* Sec. 402A has had frequent express approval. Besides
*Heavner v. Uniroyal, Inc., supra,* 63 *N. J.* at 151, see *Brody*
*v. Overlook Hospital,* 66 *N. J.* 448, 451 (1975); *Realmuto*
*v. Straub Motors,* 65 *N. J.* 336, 343 (1974); *Bexiga v.*
*Havir Manufacturing Corp.,* 60 *N. J.* 402, 407–408 (1972);
*Newmark v. Gimbel's Incorporated,* 54 *N. J.* 585, 595
(1969); *Rosenau v. City of New Brunswick & Gamon Meter*
*Co.,* 51 *N. J.* 130, 136 (1968); *Devaney v. Sarno,* 125 *N. J.*
*Super.* 414, 418 (App. Div. 1973), aff'd o.b. 65 *N. J.* 235
(1974); and *Turner v. International Harvester Company,*
133 *N. J. Super.* 277, 286 (Law Div. 1975); *cf. Glass v.*
*Ford Motor Co.,* 123 *N. J. Super.* 599 (Law Div. 1973).
And other recent decisions of this Court in the strict lia-
bility area, not mentioning the Restatement, are generally
consistent with the principles enunciated therein. *Moraca v.*
*Ford Motor Co.,* 66 *N. J.* 454 (1975); *Scanlon v. General*
*Motors Corp.,* 65 *N. J.* 582 (1974).

The heart of the approach we take toward resolution of
the matter of defendant's affirmative liability in this case
calls for a careful distinction between ordinary manufactur-
ing defects and defects of design. *Scanlon* and *Moraca,* both
*supra,* involved assertions of defects of the former type
where the product contains a variance, latent or patent, from
the manufacturer's intent; see also *Jakubowski v. Minne-*
*sota Mining and Manufacturing,* 42 *N. J.* 177 (1964). The
present case is an example of the latter, where the product
is made as intended, but is asserted to be dangerous in some
way, as is also *Bexiga v. Havir Manufacturing Corp., supra,*
60 *N. J.* 402. The distinction has been frequently drawn in
the literature. Phillips, "The Standard For Determining
Defectiveness in Products Liability," 46 *U. Cin. L. Rev.*
101, 103–105 (1977); 2 Frumer & Friedman, Products
Liability (1975) Sec. 16A [4], at 3–320; Wade, *op. cit,*
*supra,* 44 *Miss. L. J.* at 836–837; Note, 55 *Geo. L. J.* 286,
297 (1966); Cohen, "Product Design and Restatement
(Second) of Torts, Section 402A," 61 *Mass. L. Q.* 103,

104 (1976); and see *Volkswagen of America Inc. v. Young,* 272 *Md.* 201, 321 *A.* 2d 737 (Ct. App. 1974). However, there has not been uniformity in the views as to what, if anything, should be the difference in the criteria for strict liability in tort in the respective types of "defects" mentioned.

The black letter of *Rest.* 2*d* Sec. 402A does not draw the stated distinction, the requirement that the product be "in a defective condition unreasonably dangerous to the user or consumer" being facially applicable to both kinds of defects. However, Comment i of the section explains that the qualification "unreasonably dangerous" was meant to negate the notion that products normally useful, such as sugar, whiskey, tobacco, or butter, could be regarded as defective because, if used improperly, excessively or in an adulterated condition, they could also be harmful (*Id.* at p. 352). The requisite of "unreasonably dangerous," however, also extends to other manufactured objects whose utility in ordinary use outweighs the potentiality of their harmfulness. As stated in Prosser, *Torts* (1971), p. 659: "An ordinary pair of shoes does not become unreasonably unsafe merely because the soles become somewhat slippery when wet; nor is there unreasonable danger in a hammer merely because it can mash a thumb. Knives and axes would be quite useless if they did not cut."

In the case of a defect of a product in the sense of an abnormality unintended by the manufacturer, there would appear to be *prima facie* liability for physical harm proximately resulting from the defect to a user or consumer without any need for showing of unreasonable danger in any other sense. "[T]he product [would be] unreasonably dangerous as a matter of law and this would be true of virtually any fabrication or construction defect." P. Keeton, *op. cit., supra,* 5 *St. Mary's L. J.* at 39; Note, *op. cit., supra,* 10 *U. S. F. L. Rev.* at 498. See also P. Keeton, *op. cit., supra,* 20 *Syracuse L. J.* at 562–563. *Cf.* Wade, *op. cit.,*

*supra,* 44 *Miss. L. J.* at 837.[4] In apparent accord: *Scanlon v. General Motors, Inc., supra,* 65 *N.· J.* 582 (an alleged manufacturing process defect case) which stated the manufacturer would be liable "if the product left their hands in a defective condition proximately ·causing the mishap." (*Id.* at 590).

Our present decisional concern, however, is with the design defect aspect of a manufacturer's strict liability in tort. The cases in this area of the law frequently confound considerations relating to contributory negligence, assumption of risk and misuse of the product by the plaintiff with other factors relevant to liability for design defect. See Schwartz, "Strict Liability and Comparative Negligence," 42 *Tenn. L. Rev.* 171 (1974) ; Noel, "Defective Products: Abnormal Use, Contributory Negligence and Assumption of Risk," 25 *Vand. L. Rev.* 93 (1972). We shall deal with the former aspects of the instant case hereinafter. At this point of the discussion, the point to be made is that in design defect liability analysis the Section 402A criterion of "unrea-

---

[4]In this article, Dean Wade comments critically on *Cronin v. J. B. E. Olson Corp.,* 8 *Cal.* 3d 121, 104 *Cal. Rptr.* 433, 501 *P.* 2d 1153 (Sup. Ct. 1972), which holds a plaintiff need only prove a product is "defective," not that it is also "unreasonably dangerous." Among other things, the author says: "* * * the position of the California court in *Cronin,* in limiting the requirement to a defective product, would be much more sustainable if the strict liability for products which it applies were confined to the product which has its 'defect' developed unintentionally in the manufacturing process, thus leaving the design and warning cases to be ˙handled under the negligence techniques." 44 *Miss. L. J.* at 837.

In the recent case of *Barker v. Lull Engineering Company, Inc.,* 20 *Cal.* 3d 413, 143 *Cal. Rptr.* 225, 573 *P.* 2d 443 (Sup. Ct. 1978), the California court expanded on *Cronin, supra,* to hold that in a design defect case the jury may be instructed that a product is defective in design if (1) the product failed to perform as safely as an ordinary consumer would expect if used in an intended or reasonably foreseeable manner or (2) defendant fails to prove in light of the relevant factors that on balance the benefits of the design outweigh the risk of danger therein. 143 *Cal. Rptr.* 225, 573 *P.* 2d at 457–458.

sonably dangerous" is an appropriate one if understood to render the liability of the manufacturer substantially coordinate with liability on negligence principles. The only qualification is as to the requisite of foreseeability by the manufacturer of the dangerous propensity of the chattel manifested at the trial—this being imputed to the manufacturer. "Since proper design is a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer * * *." Prosser, *Torts, supra,* p. 659, n. 72. See *Volkswagen of America, Inc. v. Young, supra,* 321 *A.* 2d at 747–748; *Jones v. Hutchinson Manufacturing, Inc.,* 502 *S. W.* 2d 66, 69–70 (Ky. Ct. App. 1973).

A most useful formulation of the foregoing principles, for purposes of practical judicial implementation in design defect cases, is contained in the four articles by Deans Wade and P. Keeton cited above. This approach has recently been described as "the risk/utility analysis as developed by Deans Wade and Keeton." Note, *op. cit., supra,* 10 *U. S. F. L. Rev.* at 505. In his most recent article Dean Wade has described the approach as follows:

> The time has now come to be forthright in using a tort way of thinking and tort terminology [in cases of strict liability in tort]. There are several ways of doing it, and it is not difficult. The simplest and easiest way, it would seem, is to assume that the defendant knew of the dangerous condition of the product and ask whether he was then negligent in putting it on the market or supplying it to someone else. In other words, the scienter is supplied as a matter of law, and there is no need for the plaintiff to prove its existence as a matter of fact. Once given this notice of the dangerous condition of the chattel, the question then becomes whether the defendant was negligent to people who might be harmed by that condition if they came into contact with it or were in the vicinity of it. Another way of saying this is to ask whether the magnitude of the risk created by the dangerous condition of the product was outweighed by the social utility attained by putting it out in this fashion.
>
> Wade, *op. cit., supra,* 44 *Miss. L. J.* at 834–835.

Dean Keeton put the matter thiswise:

A product is defective if it is unreasonably dangerous as marketed. It is unreasonably dangerous if a reasonable person would conclude that the magnitude of the scientifically perceivable danger *as it is proved to be at the time of trial* outweighed the benefits of the way the product was so designed and marketed. Under the heading of benefits one would include anything that gives utility of some kind to the product; one would also include the infeasibility and additional cost of making a safer product. As the Court of Appeals for the Fifth Circuit has said, "[D]emanding that the defect render the product unreasonably dangerous reflects a realization that many products have both utility and danger." Ross v. Up-Right, Inc., 402 F. 2d 943 (5th Cir. 1968). (emphasis in original)

> P. Keeton, *op. cit., supra,* 5 *St. Mary's L. J.* at 37–38.

See also Phillips, *op. cit., supra,* 46 *U. Cin. L. Rev.* at 103.

Our study of the decisions satisfies us that this risk/utility analysis rationalizes what the great majority of the courts actually do in deciding design defect cases where physical injury has proximately resulted from the defect. Several recent cases have expressly referred to and applied the stated analysis. See *Barker v. Lull Engineering Company, Inc., supra,* 143 *Cal. Rptr.* 225, 573 *P.* 2d at 454–455; *Schell v. AMF, Incorporated,* 567 *F.* 2d 1259 (3 Cir. 1977); *Johnson v. Clark Equipment Co.,* 274 *Or.* 403, 547 *P.* 2d 132, 140 n. 12 (Sup. Ct. 1976); *Phillips v. Kimwood Machine Co.,* 269 *Or.* 485, 525 *P.* 2d 1033, 1036–1038 (Sup. Ct. 1974); *Roach v. Kononen,* 269 *Or.* 457, 525 *P.* 2d 125, 128–130 (Sup. Ct. 1974); *Dorsey v. Yoder Co.,* 331 *F. Supp.* 753, 759–760 (E. D. Pa. 1971) (a particularly thorough discussion), aff'd 474 *F.* 2d 1339 (3 Cir. 1973). See also *Balido v. Improved Machinery, Inc.,* 29 *Cal. App.* 3d 633, 105 *Cal. Rptr.* 890, 895–896 (Ct. App. 1973).

Dean Wade suggests that before determining whether the case for liability should be given to the jury the trial court should give consideration to whether a balanced consideration of the following factors did not preclude liability as a matter of law:

(1) The usefulness and desirability of the product — its utility to the user and to the public as a whole.

(2) The safety aspects of the product — the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Wade, <em>op. cit., supra,</em> 44 <em>Miss. L. J.</em> at 837–838.

 If the case is sent to the jury, since it would not always be appropriate for the court to include in the instructions to the jury all seven of the factors mentioned above, Dean Wade suggests the following model instruction:

"A [product] is not duly safe if it is so likely to be harmful to persons [or property] that a reasonable prudent manufacturer [supplier], who had actual knowledge of its harmful character would not place it on the market. It is not necessary to find that this defendant had knowledge of the harmful character of the [product] in order to determine that it was not duly safe."

<em>Id.,</em> at 839–840.

Subject to substituting the Section 402A language, "defective condition unreasonably dangerous," for the Wade-preferred "not duly safe," we approve and adopt this instruction for incorporation into a charge in an action against a manufacturer for strict liability in tort based upon the design defect of a product.[5] Such a charge would be usefully

---

[5]It must be recognized that since this formulation of liability is based upon whether a "reasonable prudent" manufacturer (with

amplified by the judge calling to the attention of the jury for their consideration any of the Wade factors mentioned above going into the risk/utility analysis for which there is specific proof in the case and especial significance (*e. g.*, here, the manufacturer's ability to eliminate the unsafe character of the product without impairing its utility or incurring too much expense; the manufacturer's asserted expectation that the machine would be operated only with the guard). It should also here be noted, although the point will be repeated in another connection, *infra,* that while foreseeability by the defendant of the harmful character (dangerous proclivity) of the product is not a requisite to liability, foreseeability (objective) of the kind of use (or misuse) of the product which occurred is a relevant factor. See *Newman v. Utility Trailer & Equip. Co. Inc.,* 278 *Or.* 395, 564 *P.* 2d 674, 676–677 (Sup. Ct. 1977); *Galvan v. Prosser Packers, Inc.,* 83 *Wash.* 2d 690, 521 *P.* 2d 929, 931 (Sup. Ct. 1974); *cf. Eshbach v. W. T. Grant's and Company,* 481 *F.* 2d 940, 942–943 (3 Cir. 1973); *Rest. 2d* Sec. 402A, Comment h.

As noted above, examination of many design defect cases decided in recent years reflects the actual deployment by the courts of the risk/utility analysis, although it is generally not denominated as such, and not all of the Wade balancing factors are necessarily adverted to. *Bexiga v. Havir Manufacturing Corp., supra,* 60 *N. J.* at 409–410; *Turner v. International Harvester Company, supra,* 133 *N. J. Super.* at 292–293; *Barker v. Lull Engineering Company, Inc., supra; Schell v. AMF, Incorporated, supra; Korli v. Ford Motor Co.,* 69 *Cal. App.* 3d 115, 137 *Cal. Rptr.* 828, 832–833 (Ct.

___

assumed knowledge of the dangerous proclivity of the article) would have marketed the article, Subsection (2) (a) of *Rest. 2d* Sec. 402A is not applicable in design defect cases. Subsection (2) states: "the rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product." See *Volkswagen of America, Inc. v. Young, supra,* 321 *A.* 2d at 747–748.

App. 1977); *Raney v. Honeywell, Inc.*, 540 *F.* 2d 932, 934–935 (8 Cir. 1976); *Davis v. Fox River Tractor Company*, 518 *F.* 2d 481, 484 (10 Cir. 1975); *Pike v. Frank G. Hough Co., supra*, 85 *Cal. Rptr.* 629, 467 *P.* 2d at 236–237; *Carpenter v. Koehring Company*, 391 *F. Supp.* 206, 210 (E. D. Pa. 1975), aff'd 527 *F.* 2d 644 (3 Cir. 1976); *Ford v. Harnischfeger Corporation*, 365 *F. Supp.* 602, 606–607 (E. D. Pa. 1973); *Thomas v. General Motors Corp.*, 13 *Cal. App.* 3d 81, 91 *Cal. Rptr.* 301, 305 (Ct. App. 1971).

Strict tort liability under *Rest.* 2d Sec. 402A for design defects is not appropriately circumscribed by the warranty test of whether the article is reasonably fit for its intended purpose or use, notwithstanding strict liability in tort began here and elsewhere by borrowing warranty concepts in order to avoid the need of establishing negligence. See *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358 (1960); *Santor v. A & M Karagheusian, Inc.*, 44 *N. J.* 52 (1965); and the discussion in *Heavner v. Uniroyal, Inc., supra*, 63 *N. J.* at 146–148; Rapson, "Products Liability Under Parallel Doctrines; Contrasts Between The Uniform Commercial Code and Strict Liability In Tort," 19 *Rutgers L. Rev.* 692, 698–703 (1965). As pointed out by Dean Wade, in situations "involving design matters, the consumer would not know what to expect, because he would have no idea how safe the product could be made." Wade, *op. cit., supra*, 44 *Miss. L. J.* at 829; see also P. Keeton, *op. cit., supra*, 5 *St. Mary's L. J.* at 36–37. The fact that the instant machine was commercially "reasonably fit for its intended purpose" of pelletizing plastic strands is obviously irrelevant to the postulate of strict tort liability to a workman injured by reason of the unsafety of the machine due to a design defect. *Cf. Barker v. Lull Engineering Company Inc., supra*.

The general outline of a rationale for the affirmative case of strict liability for design defects in a manufactured product includes the condition that the product is not being misused or abnormally used except where such latter kinds of use are foreseeable. *Rest.* 2d Sec. 402A, Comment h;

Prosser, *Torts, supra,* at 668–669. Abnormal use or misuse has also been conceptualized as negating proximate cause — a view taken by the Appellate Division here. 138 *N. J. Super.* 353, n. 4. If it is the plaintiff who has misused the product, negation of liability is sometimes posited on contributory negligence. *Maiorino v. Weco Products Co.,* 45 *N. J.* 570, 574 (1965). However, abnormal use is not an affirmative defense; it is rather for the plaintiff, in undertaking to prove that the unreasonable dangerousness of the article caused the injury, to show there was no abnormal use. See Noel, *op. cit., supra* (25 *Vand. L. Rev.* at 96) ; Wade, *op. cit., supra,* 44 *Miss. L. J.* at 846–847; *Comment,* 80 *Dick. L. Rev.* 245 (1976).

It is, however, clear that many, if not most jurisdictions now acknowledge that in applying strict liability in tort for design defects manufacturers cannot escape liability on grounds of misuse or abnormal use if the actual use proximate to the injury was objectively foreseeable. See, *e. g., Schell v. AMF, Incorporated, supra,* 567 *F.* 2d at 1262; *Raney v. Honeywell, supra,* 540 *F.* 2d at 934 (Iowa law) ; *Suchomajcz v. Hummel Chemical Co.,* 524 *F.* 2d 19, 28 (3 Cir. 1975) (Pa. law) ; *Larsen v. General Motors Corp.,* 391 *F.* 2d 495, 502 (8 Cir. 1968) (Mich. law) ; *Smith v. Hobart Manufacturing Co.,* 302 *F.* 2d 570, 575 (3 Cir. 1962) (Pa. law) ; *Holmgren v. Massey-Ferguson, Inc.,* 394 *F. Supp.* 910, 917 (D. N. D. 1974), rev'd on other grounds, 516 *F.* 2d 856 (8 Cir. 1975) (N. D. law) ; *Grant v. National Acme Co.,* 351 *F. Supp.* 972, 977–78 (W. D. Mich. 1972) (Mich. law) ; *Buccery v. General Motors Corp.,* 60 *Cal. App.* 3d 533, 132 *Cal. Rptr.* 605, 614 (Ct. App. 1976) ; *Johnson v. American Motors Corp.,* 225 *N. W.* 2d 57, 65 (N. D. 1974) ; *Micallef v. Miehle Co.,* 39 *N. Y.* 2d 376, 384 *N. Y. S.* 2d 115, 121, 348 *N. E.* 2d 571, 577 (Ct. App. 1976) ; *Ethicon, Inc. v. Parten,* 520 *S. W.* 2d 527, 532 (Tex. Civ. App. 1975) ; *Dorsey v. Yoder Company, supra,* 331 *F. Supp.* at 760; *Newman v. Utility Trailer & Equip. Co. Inc., supra,* 564 *P.* 2d 674. Foreseeability in the fore-

going application may be "reasonable foreseeability," (*i. e.*, objective, it need not be actual. Noel, *op. cit., supra,* 25 *Vand. L. Rev.* at 100.

In concluding this phase of the discussion of the law, we take notice of the fact that in *Brody v. Overlook Hospital, supra,* 66 *N. J.* 448, this Court left open the question whether the requirement of *Rest. 2d* Sec. 402A that the product in question be "unreasonably dangerous" should be deemed generally applicable in contexts other than that of drugs and blood-transfusions, to which it was expressly held applicable by the Appellate Division in that case. 127 *N. J. Super.* 331 (1974). See 66 *N. J.* at 451. This reservation was due to the fact that in *Cronin v. J. B. E. Olsen Corporation, supra,* 104 Cal. Rptr. 433, 501 *P.* 2d 1153, to which case we made reference, the California Supreme Court had held that it would not follow the Sec. 402A requirement of "unreasonably dangerous" but look only to whether the product was "defective." The court sustained a verdict for an injured plaintiff despite the omission of the "unreasonably dangerous" language from the criteria of liability as charged to the jury. The defect there involved was in a hasp holding bread trays in position in a bakery delivery truck. Because of "holes, cracks and voids" in the metal of the hasp it gave way, causing the loaded trays to be driven into the driver during a traffic incident, with resulting injury. It is not evident whether the defect there was one of manufacturing process (unintended condition of product) or one of unsafe design. The court felt that retention of the test of "unreasonably dangerous" diluted the intent of the strict liability in tort doctrine to relieve plaintiffs of problems of proof of negligence. 104 *Cal. Rptr.* 433, 501 *P.* 2d at 1162.

*Cronin* has been widely criticized as providing no useful definition of an actionable defect, particularly in relation to a case of a product of unsafe design. *Wade, op. cit., supra,* 44 *Miss. L. J.* at 831–832; *P. Keeton, op. cit. supra,* 5 *St. Mary's L. J.* at 30–32. As stated by Dean Keeton in the latter article, "* * * the difficulty is that no content was

given [by *Cronin*] to the concept of defect and this is vitally important when a plaintiff's theory is that a product, although fabricated and constructed as it was intended to be, subjected users or others to an inherent risk of harm that made the product defective." *Id.* at 31. Soundly making essentially the same point is Note, 5 *Seton Hall L. Rev.* 152, 165–166 (1973) and the opinion in *Turner v. International Harvester Company, supra,* 133 *N. J. Super.* at 291–292. Note, however, that since *Cronin* the California court has undertaken to give more specific content to the concept of defect. *Barker v. Lull Engineering Company, Inc., supra.* See note 4, *supra.*

■ It should be apparent from our discussion above of the Wade-Keeton risk/utility analysis of strict liability for defective products that we approve the *Rest. 2d* Sec. 402A criterion of "unreasonably dangerous" if understood conformably therewith.[6] It is probable, as intimated in the said discussion, that liability could be premised on the fact of defect alone, where that defect is the result of an unintended manufacturing error or mischance, and proximately related to the personal injury, see *Scanlon v. General Motors Corp., supra,* 65 *N. J.* at 590. In such case, the added *Restatement* requirement that the defect be unreasonably dangerous could either be discarded or held satisfied in such instance as a matter of law. P. Keeton, *op. cit., supra,* 5 *St. Mary's L. J.* at 39. We may leave definitive resolution of the matter to a case calling for it. It will suffice for purposes of the case at bar, which

---

[6]References to an "unreasonably dangerous" condition are found in some of our prior cases. *Moraca v. Ford Motor Co., supra* 66 *N. J.* at 460; *Rosenau v. City of New Brunswick & Gamon Meter Co., supra,* 51 *N. J.* at 136, where the term is used interchangeably with "dangerously defective" condition; *Jakubowski v. Minnesota Mining and Manufacturing, supra,* 42 *N. J.* at 182; *Bexiga v. Havir Manufacturing Corp., supra* (approving *Rest. 2d* Sec. 402A and also adverting to "an unreasonable risk of harm") (60 *N. J.* at 408, 410). *Cf. Newmark v. Gimbel's, Incorporated, supra,* 54 *N. J.* at 595 ("dangerously defective condition").

is clearly a situation of alleged design defect, that the Restatement criterion of "unreasonably dangerous" remains soundly applicable thereto. To the extent that the decision in *Glass v. Ford Motor Co., supra,* 123 *N. J. Super.* 599, may be read to the contrary, it is herewith disapproved.

## *IV*

In the light of the previous discussion of the facts and the law, the Appellate Division rationale for finding no affirmative basis for liability as a matter of law is plainly insupportable. This was that since a safety device came with the machine the manufacturer was entitled to the conclusive presumption that it would always be used. 138 *N. J. Super.* at 351. While we cannot fault the theoretical approach of the Appellate Division — it purported to apply the risk/utility analysis (without using that terminology) — nevertheless the court gave insufficient consideration to the potential jury question arising from the evidence as to the foreseeability that the machine would sometimes be operated without the guard. It makes no difference that, as the Appellate Division pointed out, no issue as to such foreseeability was tendered the jury nor any instruction thereon sought from the trial court. 138 *N. J. Super.* at 352, n. 3. While it would have been helpful for the trial court to have referred to that matter (as well as to other of the risk/utility factors; see *supra,* pp. 174–175, the matter of potential misuse or abnormal use is inherent in the overall general issue of the alleged unreasonable dangerousness of the machine, see discussion *supra,* Point III, and that issue was definitely submitted to the jury. And we are in disagreement with the Appellate Division's observation that there was no "evidence tending to suggest that the manufacturer should have foreseen such an occurrence." *Ibid.*

As already indicated, there was credible evidence that the guard had to be removed frequently during operations. Human nature being what it is, we believe a jury might have

inferred that a reasonable manufacturer, from that fact, could have objectively expected that on occasion production with the machine would be resumed without replacing a guard just removed in a clean-out operation. Compare *Shell v. AMF, Incorporated, supra,* 567 *F.* 2d at 1262–1263. Even the defendant's safety expert conceded that if the facts as to frequency of need for removal of the guard were as testified to by plaintiff's witnesses, the machine would be unsafe without an interlock. In any event, balancing the degree of such objective foreseeability with the gravity of the risk to a workman operating the machine without the guard and the feasibility and inexpensiveness of installing an interlock in 1956, when the machine was sold, a jury could properly, on the evidence, have found the injury to have resulted from an unreasonably dangerous condition of the machine. *Schell v. AMF, Incorporated, supra.* That another jury could reasonably have found to the contrary, does not, of course, affect the validity of the stated conclusion.

The cases relied upon by the Appellate Division are somewhat supportive of its position, but are all rulings on distinctly different and distinguishable fact patterns. Both *Smith v. Hobart Manufacturing Co., supra,* 302 *F.* 2d 570 and *Ward v. Hobart Manufacturing Co.,* 450 *F.* 2d 1176 (5 Cir. 1971) were decided on negligence, not strict liability, claims. In *Smith* a workman had inserted his hand into a meat grinder after the employer permanently removed the guard supplied with the machine. *Tuttle v. U. S. Slicing Machine Co.,* 335 *F.* 2d 63 (4 Cir. 1964) was a somewhat similar case. The court in *Smith* conceded that if the manufacturer had reason to believe that the employer would remove the guard, the willful or wanton nature of the removal would not have constituted a superseding cause *vis a vis* the manufacturer's negligence. 302 *F.* 2d at 575. In *Ward,* the grinder had come with a guard and written instructions for the operator to keep his hands out, but by the time plaintiff, a subsequent purchaser, acquired it, the guard and instructions were not with the machine. In *Ford Motor Company v. Eads,*

224 *Tenn.* 473, 457 *S. W.* 2d 28 (Sup. Ct. 1970), the wiring on a tractor had been "hot wired" by plaintiff's brother, and the court held that such act was an intervening cause of the accident such that any defect in the tractor did not constitute a proximate cause thereof. In *Brown v. General Motors Corp.,* 355 *F.* 2d 814 (4 Cir. 1966), the court found knowing misuse by the plaintiff of a tractor as a matter of law. This may have been a correct decision on the particular facts.

We conclude that these cases did not compel a determination for the defendant as a matter of law on the record of the present case as tried. The most recent safety-defect cases evidence a trend to submit the ultimate issue of defectiveness to the jury. See *Schell v. AMF, Incorporated, supra,* 567 *F.* 2d 1259; *Galvan v. Prosser Packers, Inc., supra,* 521 *P.* 2d 929; *Stanfield v. Medalist Industries, Inc.,* 34 *Ill. App.* 3d 635, 340 *N. E.* 2d 276 (Ct. App. 1975); *Raney v. Honeywell, Inc., supra,* 540 *F.* 2d 932; *Davis v. Fox River Tractor Co.,* 518 *F.* 2d 481 (10 Cir. 1975); *Carpenter v. Koehring Co., supra,* 391 *F. Supp.* 206; *Dorsey v. Yoder Co., supra,* 331 *F. Supp.* 973; *Micallef v. Miehle Co. etc., supra,* 384 *N. Y. S.* 2d 115, 348 *N. E.* 2d 571; *Scott v. Dreis & Krump Manufacturing Co.,* 26 *Ill. App.* 3d 971, 326 *N. E.* 2d 74 (1975). But see *Jones v. Hutchinson Manufacturing Inc., supra,* 502 *S. W.* 2d 66; *Bartkewich v. Billinger,* 432 *Pa.* 351, 247 *A.* 2d 603 (Sup. Ct. 1968).

## V

On defendant's appeal to the Appellate Division it raised the point that the jury's findings of contributory negligence of the plaintiff and of absence of proximate cause between such contributory negligence and the accident were inconsistent and that the latter finding was against the weight of the evidence. Alternative to a claim for reversal and exculpation of liability entirely, it sought a new trial on the grounds stated. The Appellate Division decision did not reach the issue. 138 *N. J. Super.* at 357. Before explaining why we

think the defendant's demand for a new trial on such grounds is well-taken, we address the contention of plaintiff, endorsed by the dissent herein, and relying on *Bexiga v. Havir Manufacturing Corp., supra,* 60 *N. J.* 402, that on these facts contributory negligence is not a defense at all, and that therefore any inconsistency in the special findings of the jury referred to is legally immaterial.

It will be appropriate initially to review the status of contributory negligence as a defense to an action for strict liability in tort, as of the time of the *Bexiga* decision, both in this State and generally.

In *Cintrone v. Hertz Truck Leasing, etc.,* 45 *N. J.* 434 (1965), we held the lessor of a truck strictly liable in tort for brake failure to an employee of the lessee injured thereby. However, we sustained the submission of the defense of contributory negligence to the jury when it appeared that the plaintiff knew for several days before the accident that the brakes were defective but neglected to report the condition, and, with such knowledge, rode in the truck for several hours until the occurrence of the accident. Writing for the Court, Justice Francis cited with apparent approval Dean Prosser's analysis of the cases making a distinction between the situation wherein "the plaintiff negligently failed to discover the defect in the product or to guard against the possibility of its existence," on the one hand, and that in which "the plaintiff has discovered the defect and the danger, and has proceeded nevertheless to make use of the product," on the other. 45 *N. J.* at 458. In the former situation the defense is disallowed; in the latter, it is permitted. The second class of cases was described as that "form of contributory negligence which consists of deliberately and unreasonably proceeding to encounter a known danger, and overlaps assumption of risk." *Ibid.*

The *Cintrone* Court pointed out that Comment n (see *infra*) to § 402A of the Tentative Draft No. 10 *Restatement, Second, Torts* (1964) (finally adopted by the A. L. I. in 1965; see *supra*) adopted the Prosser distinction outlined

above. (45 *N. J.* at 458). It is obvious that the decision in *Cintrone* was in accord with the Prosser and *Restatement* view as to the availability of the defense of contributory negligence in its so-called assumption of risk aspect. *Cf. Maiorino v. Weco Products Co.*, 45 *N. J.* 570 (1965).

*Ettin v. Ava Truck Leasing, Inc.*, 53 *N. J.* 463 (1969), represents an apt example of the kind of fault by a plaintiff. which will not defeat recovery in strict liability in tort under the dichotomy espoused by Dean Prosser and Comment n of *Rest.* 2d Sec. 402A, and inferentially approved by this Court in *Cintrone v. Hertz Truck Leasing, etc., supra*. As in *Cintrone,* the plaintiff in *Ettin* was an employee of a lessee of a truck. The truck, driven by plaintiff, collided with a trailer truck parked across the highway, essentially because of sudden failure of the brakes on the leased truck. In an action for recovery on theories both of warranty and strict liability in tort the Court addressed the merits of the removal from the case by the trial judge of the defense of contributory negligence. In sustaining the action of the trial court and the consequent judgment for plaintiff the Court alluded, as it did in *Cintrone, supra,* to 'Comment n of *Rest.* 2d Sec. 402A, particularly that portion stating: "* * * contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence." 53 *N. J.* at 472. The Court found that provision applicable to the facts before it and contrasted the facts and holding in *Cintrone, supra,* where the other category of plaintiff's fault expressed in said Comment n was found pertinent, *i. e.,* the unreasonable and voluntary encountering by the plaintiff of a known danger. 53 *N. J.* at 473.

The broad consensus of American decisional law and writing in the strict liability field, except to the extent that the concept of comparative fault is beginning to gain acceptance therein (see discussion *infra* p. 189), is expressed by Comment n, *Rest.* 2d Sec. 402A, alluded to above. It reads:

Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

■ Thus, although a species of plaintiff's conduct frequently denominated as assumption of the risk is recognized as a defense to strict liability in tort, our New Jersey law subsumes conduct of that nature, for purposes of ordinary negligence actions, under the general category of plaintiff's fault, or, as conventionally expressed, contributory negligence in its broad aspect. *Meistrich v. Casino Arena Attractions, Inc.,* 31 *N. J.* 44, 51 (1959).

■ However, it is implicit in Comment n and the generality of the cases that only a limited range of a plaintiff's conduct — not contributory negligence in the sense of mere carelessness or inadvertence — can be a defense to an action for strict liability in tort for injuries sustained as the result of a product defect, particularly if the defect is one of unsafe design. See *Bachner v. Pearson,* 479 *P.* 2d 319, 329–330 (Alas. Sup. Ct. 1970) ; *Keener v. Dayton Electric Manufacturing Company,* 445 *S. W.* 2d 362, 365 (Mo. Sup. Ct. 1969) ; *Collins v. B. F. Goodrich Co.,* 558 *F.* 2d 908, 911 (8 Cir. 1977) ; *Williams v. Brown Manufacturing Company,* 45 *Ill.* 2d 418, 261 *N. E.* 2d 305 (Sup. Ct. 1970). We agree with the statement in the latter case that acceptance of "ordinary" contributory negligence as a defense in actions for strict liability in tort would be incompatible with the policy considerations which led to the adoption of strict tort liability in the first instance. 261 *N. E.* 2d at 310. The manufacturer's duty is imposed precisely to avert foreseeable inadvertent injury to a user of a product. *Bexiga v. Havir Manufacturing Corp., supra,* 60 *N. J.* at 412. Thus, in the

case at bar, plaintiff's carelessness, if any, in getting his hand caught in the plastic strands is not a defense, and so much of the trial court charge on contributory negligence in the present case which could have been otherwise understood by the jury should not be repeated at the retrial.[7]

We believe the law in this State and the vast majority of others accords with the foregoing hypothesis of a defense of contributory negligence to strict liability in tort based upon a voluntary and unreasonable encountering by the plaintiff of a known safety hazard of a machine where proximately contributive to the accident. In addition to the New Jersey Supreme Court decisions in *Cintrone v. Hertz Truck Leasing, etc.* and *Ettin v. Ava Truck Leasing Inc.*, both *supra*, see *Devaney v. Sarno, supra,* 125 *N. J. Super.* at 417–418. See also Prosser, *Torts, supra,* at 670–671; *Annot.* 46 *A. L. R.* 3d 240, 243 (1972); 2 Frumer & Friedman, *op. cit., supra,* §§ 16.01 [3], 16A [5] [f]; R. Keeton, "Assumption Of Products Risks," 19 *Sw. L. J.* 61 (1965); Levine, "Buyer's Conduct as Affecting the Extent of Manufacturer's Liability in Warranty," 52 *Minn. L. Rev.* 627 (1968); Noel, *op. cit., supra* (25 *Vand. L. Rev.* 93); Polelle, "The Foreseeability Concept and Strict Products Liability: The Odd Couple of Tort Law," 8 *Rutgers-Camden L. J.* 101, 112, 133–134 (1976).

With the foregoing background in mind, we turn to the contention of the plaintiff, embraced by the dissent herein, that our decision in *Bexiga, supra,* calls for rejection of the

---

[7]The conclusions here arrived at as well as the reasoning in *Bexiga, supra,* will require a qualification of the somewhat expansive language employed in *Maiorino v. Weco Products Co., supra,* purporting to exculpate a defendant responsible for a product defect where the consequences thereof "cannot be separated" from "plaintiff's own proximate contributory carelessness." 45 *N. J.* at 574. That language should be confined to the facts of the case, which involved a plaintiff using an abnormal method of opening a glass container for a new toothbrush. See *Ettin v. Ava Truck Leasing, Inc., supra,* 53 *N. J.* at 471.

defense of contributory negligence, even in its limited assumption of risk aspect, as a matter of law.

*Bexiga* involved a power punch press which contained no safety device. The operator was required to place by hand a metal disc on a die, and then, after removing his hand, by foot pedal activate a ram which would come down and punch holes in the disc. Plaintiff was a novice 18 year old worker, working on the machine for the first time. While he was readjusting a disc on the die, plaintiff's foot inadvertently made contact with the pedal, causing the ram to descend and crush plaintiff's hand. The principal issue in the case was whether the defendant manufacturer was entitled to rely on an industry custom that the purchaser rather than the manufacturer supply safety devices to prevent such accidents (*e. g.,* one which would require engagement of both the operator's hands away from the die area to activate the ram). The Court held in the negative on that question. 60 *N. J.* at 410.

In respect of the matter of plaintiff's alleged contributory negligence, the Court, after conceding that in some circumstances contributory negligence may be a defense to an action for strict liability in tort, citing the *Cintrone, Ettin* and *Maiorino* cases, all *supra,* pointed out that in *Ettin* it had been observed that in "special" situations the defense would not be allowed. 60 *N. J.* at 412. One special situation cited in *Ettin* was *Bahlman v. Hudson Motor Car Co.,* 290 *Mich.* 683, 288 *N. W.* 309 (1939), where despite the fact that plaintiff's negligence in driving his car caused it to turn over he was allowed to recover from the manufacturer of the car for head injuries caused by a jagged welded seam in the top, as against a warranty of a "safety top." See *Ettin, supra,* 53 *N. J.* at 473–474. In terms of the distinction as to contributory negligence made in Comment n of *Rest.* 2d Sec. 402A (also expressly cited in *Ettin,* see *supra*) the plaintiff's negligence in *Bahlman* was ordinary carelessness, not the voluntary unreasonable self-exposure to the hazard

which made the vehicle unsafe. It could therefore not be a defense in a strict liability action for a machine defect.

However, the Court in *Bexiga* went on to say:

> The asserted negligence of plaintiff — placing his hand under the ram while at the same time depressing the foot pedal — was the very eventuality the safety devices were designed to guard against. It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against. 60 *N. J.* at 412.

Reading this language against the background of *Cintrone* and *Ellin*, cited by the Court without any deprecation of the continued authority of those cases, and against the factual context of *Bexiga*, the Court was essentially holding that plaintiff was as a matter of law not contributorily negligent within the limited aspect of that defense, set forth in Comment n of *Rest.* 2d Sec. 402A, consisting of the voluntary and unreasonable self-exposure to a known danger. The plaintiff was not unreasonable in working the machine; either he worked it "as is" or he had no job. There is no indication that the unsafety of the machine was known to him. He did not voluntarily expose himself to a known danger. His negligence, if any, was in the inadvertent contact with the foot pedal — conduct characteristically not a bar under the contributory negligence distinction made by Comment n of the Restatement provision and the generality of the cases, particularly our own decisions in *Cintrone* and *Ellin, supra*.

The factual distinctions between *Bexiga* and the instant case in terms of the applicability of Comment n are obvious. The evidence here would permit a jury to find that plaintiff knew the purpose of the guard, knew it was off the machine when he came to work and also that he had been warned that he could be seriously injured if he worked the machine without the guard. The jury could also infer that plaintiff could have had the guard placed back on the machine by calling the attention of the foreman to the matter.

 It is our view that on the proofs a jury could find either way as to whether plaintiff unreasonably and voluntarily subjected himself to a known danger by operating the machine without the guard on it. The dissent herein inappropriately resolves all inferential and credibility issues relative to the stated proposition in favor of the plaintiff.

 Returning to plaintiff's assertion that the rationale of *Bexiga, supra,* eliminates contributory negligence, even in its aspect of unreasonable, voluntary self-exposure to a known hazard, as a defense, it is evident from the foregoing discussion that to accept it would fly in the face of the almost unanimous view of the authorities, courts as well as writers, and synthesized by the American Law Institute in *Rest.* 2d Sec. 402A, Comment n, quoted above. Until such time as consideration is given in this State to extending the principle of comparative negligence or fault to strict liability in tort, see *Ettin v. Ava Truck Leasing, Inc., supra,* 53 *N. J.* at 474; Phillips, *op. cit., supra,* 46 *U. Cin. L. Rev.* at 109; Wade, *op. cit., supra,* 44 *Miss. L. J.* at 850–851; Kroll, "Comparative Fault: A New Generation in Product's Liability," *Ins. L. J.* Aug. 1977, p. 492; Schwartz, "Strict Liability and Comparative Negligence," 42 *Tenn. L. Rev.* 171, 178, 179–181 (1974),[8] the continuance of unreasonable[9] voluntary exposure of oneself to a known danger as a defense

---

[8]The New Jersey Comparative Negligence Act became effective in 1973. *L.* 1973, *c.* 146 (*N. J. S. A.* 2A:15–5.1 *et seq.*), As the cause of action here arose in 1968, the statute is not applicable thereto, even if otherwise considered pertinent. *L.* 1973, *c.* 146, sec. 4.

[9]A *reasonable* voluntary exposure of the plaintiff to a known hazard should not excuse a defendant from liability for marketing an unreasonably dangerous machine. *Cf.* James, "Assumption of Risk: Unhappy Reincarnation," 78 *Yale L. J.* 185, 188–189 (1968). Compare Marschall, "An Obvious Wrong Does Not Make A Right: Manufacturer's Liability for Patently Dangerous Products," 48 *N. Y. U. L. Rev.* 1065, 1090 (1973).

to strict liability in tort seems a fair balance of justice and policy in this area.[10]

■■■ As indicated at the head of this point, we are of the view that there is merit in defendant's contention, raised before the Appellate Division, that the jury's special findings both of contributory negligence and absence of proximate causal relation thereof with the accident, are so inconsistent as to require a new trial. If plaintiff was contributorily negligent within the parameters of the judge's charge, either in undertaking to work the machine without the presence of the guard or in any other aspect of his activity, there inevitably was a direct causal relation between such conduct and plaintiff's accident. *Pappas v. Santiago,* 66 *N. J.* 140 (1974).

---

[10]Our view of the law in this area is not essentially dissimilar from the authorities cited in the dissent. In Marschall, *op. cit., supra,* 48 *N. Y. U. L. Rev.* at 1090, it is stated:

Once a breach of a defendant's duty is established under this paradigm, however, *only intentional and unreasonable conduct, never mere inadvertence,* should defeat the plaintiff's right to recover. *For the most part,* traditional notions of contributory negligence and assumption of risk should disappear. * *̄ *̣
(emphasis added).

Referring to *Bexiga* the same author says:

As the *Bexiga* court so correctly perceived, the defendant's duty to provide safeguards against obvious dangers is imposed precisely to prevent harm to *inadvertent* users. (emphasis ours).
See text at p. 188, *supra.*

The note in 86 *Harv. L. Rev.* 923 (1973), while approving the result in *Bexiga,* nevertheless says (p. 931) :

None of these considerations [spreading the cost of industrial accidents among all consumers of the product] applies with the same force, however, when the worker is injured because he has failed to use the machine for its intended purpose or because he has willfully engaged in dangerous conduct. Here, a factory worker may well be the best cost avoider; only a trivial effort on his part would be required to prevent such accidents. The manufacturer, on the other hand, may be unable to avoid injuries resulting from reckless behavior, even if he installs the most advanced safety devices.

The trial court denied a motion for a new trial based on this ground, holding that the jury could have concluded that plaintiff's contributory negligence was not a substantial factor in bringing about the injury. This reasoning is plainly lacking in substance. If plaintiff was guilty of contributory negligence in the sense of unreasonable voluntary exposure of himself to a known hazard, that was obviously a substantial factor in bringing about the accident. There is no way, beyond sheer speculation, of determining what reasoning or considerations led the jury to these co-ordinate findings. In such circumstances, the verdict as to contributory negligence is suspect, and a just resolution of this controversy will require a new trial in the present case on the issue of unreasonable voluntary exposure to a known risk by plaintiff. The jury will not be asked to make a determination of proximate cause as to the latter, if they find in the affirmative on that issue. Moreover, the issue of damages need not be retried. The verdict of damages returned at the trial will stand should plaintiff prevail on the merits at the retrial.

We are not requiring the new trial to extend to the issue of defendant's primary liability as there is nothing before us to impugn the jury's special findings in respect of that issue. *Cf. Pappas v. Santiago, supra.*

 For the benefit of the trial court in charging the jury at the retrial, we remind it to avoid alluding to any duty by plaintiff of reasonable care or prudence in the ordinary sense of contributory negligence but to confine the defense to voluntary unreasonable encountering of a known danger, conformably with the views stated above. While the court at the trial properly qualified the defense in terms of plaintiff "unreasonably" as well as "voluntarily" encountering a known danger, it would be helpful in a case like this to explain to the jury that given action may be found to be reasonable if taken by a workman under the reasonable understanding that such action is expected of him or acceptable in the performance of his work, although involving the encountering of a known hazard. *Coffey v. Middlesex-*

*Spotswood, Inc.,* 52 *N. J. Super.* 39, 43 (App. Div. 1958), certif. den. 28 *N. J.* 186 (1958) ; *cf. McGrath v. American Cyanamid Co.,* 41 *N. J.* 272, 275 (1963) ; *Meistrich v. Casino Arena Attractions, Inc., supra,* 31 *N. J.* at 51; *Benton v. Y. M. C. A.,* 27 *N. J.* 67, 70–71 (1958). See Twerski, Old Wine in a New Flask — Restructuring Assumption of Risk in the Products Liability Era," 60 *Iowa L. Rev.* 1, 27 (1974). Conceivably, the absence of such a special instruction may have contributed to the jury's inconsistent findings on contributory negligence and absence of proximate cause thereof.

## VI

It remains to deal with defendant's objections to certain other trial rulings, as the points involved may arise at the retrial again.

### A

It is implicit in our discussion above of both the basis for affirmative liability of defendant and of the defense of contributory negligence (in the sense of voluntary assumption of risk) that both of these matters were for the jury on the proofs and that therefore the denial of judgment for defendant as a matter of law on either or both of these issues was proper.

### B

On cross-examination of plaintiff's expert, Stewart, defendant inquired whether he had made a study of safety regulations promulgated by the Bureau of Engineering and Safety of the State Department of Labor, as they "applied to this machine." The apparent intent was to establish that there was no such regulation. Plaintiff objected, and, in the course thereof, announced that if the objection was overruled he would offer evidence (previously the subject of an exclusionary ruling by the court) that subsequent to the accident

an official of the state department had ordered Rotuba Extruders to install an interlock on the machine. The court then announced that if defendant persisted in its proffer it would be "opening the door" and the plaintiff would be permitted to introduce the evidence last referred to. Thereupon defendant withdrew the question.

Apart from the merits of either evidential question implicated in the defendant's proffer and in plaintiff's countering threat and the consequent declaratory ruling by the court as to the latter, we think the procedural approach to a determination of the questions raised, taken by the court, was inappropriate. Plaintiff's objection to defendant's question should have been required to be confined to the merits thereof as a matter of evidence, and the trial court's ruling should have likewise been confined thereto.

 As a matter of evidence law, defendant was entitled to a response to his initial question but not necessarily to develop the fact that there was no official regulation respecting interlocks on pelletizing machines. Although safety codes in existence when a machine is marketed are admissible, albeit not conclusive as to defectiveness *vel non* of an impugned machine, *McComish v. DeSoi*, 42 *N. J.* 274 (1964), defendant was not undertaking to prove a safety code but the absence of one in relation to such machines. Although we eschew a definitive ruling, absent the text of the material intended to be adduced, the matter of admissibility of the non-existence of a regulation would appear to be a matter for the discretion of the trial court.

 As to the alleged official order to equip the machine with an interlock after the accident, we are of the view that it was inadmissible on the issue of the unreasonable dangerousness of the machine as that question was to be determined as of the date the machine was sold by defendant, not as of twelve years later.[11] *Rest.* 2d Sec. 402A, Comment g.

---

[11]The evidence would not have been inadmissible under *Evid. R.* 51, dealing with subsequent remedial conduct of a defendant, as the

## C

Defendant complains of the refusal of the trial court to grant a number of its requests to charge the jury. We have examined all of these and conclude that while one or more of them might have been appropriately included in the instructions to the jury, none was so essential, in the light of the entirety of the charge as given, as to constitute its denial a ground of reversal.

The judgment of the Appellate Division is reversed, and the cause is remanded to the Law Division for a limited new trial, subject to the conditions stated hereinabove.

SCHREIBER, J., concurring and dissenting. I concur in the majority's conclusion that the jury's adjudication of defendant's liability should be reinstated. However, I must respectfully dissent from its refusal to abide by this Court's pronouncement in *Bexiga v. Havir Manufacturing Corp.*, 60 *N. J.* 402 (1972). There we rejected, as a matter of law, a manufacturer's defense of contributory negligence in an industrial accident. I submit that the same policy is applicable here. A manufacturer's duty to install a safety device should not be excused when the accident which occurred was the very same mishap which would have been prevented had the manufacturer fulfilled its duty to the plaintiff worker.

At the outset it must be remembered that the burden of proving contributory negligence rested on the defendant manufacturer, and that when policy and justice have dictated it has been held unavailable as a defense. It is fitting and proper that the record be reviewed, keeping in mind that we do not adhere to the "scintilla" of evidence rule, *Long v. Landy,* 35 *N. J.* 44, 54 (1961), and that, when the proof of a fact is so strong as to admit of no reasonable doubt as to its existence, that fact must be accepted. Chief Justice Vanderbilt in *Ferdinand v. Agricultural Ins. Co. of Water-*

purported subsequent installation of the interlock was not a voluntary action of defendant but by reason of an official demand.

*town, N. Y.,* 22 *N. J.* 482 (1956), articulated the latter principle in the following manner:

> But when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury. [*Id.* at 494]

Utilizing these tests, which the majority has seen fit to ignore, we find upon a careful review of the record in this case no evidence demonstrating the plaintiff's carelessness in the manner in which he operated the machine.

The purpose of the machine was to cut plastic into tiny pellets. The operator fed plastic strands into the machine, which were sucked in between two rollers. In appearance and operation the rollers resembled the old-fashioned home laundry drying wringers. After passing through the rollers, the plastic was cut by knives affixed to a rotating drum. A piece of metal inserted in front of the entire width of the rollers acted as a guide by directing the plastic strands into the rollers and as a guard by preventing the operator's hand from reaching the rollers. When in place the guide guard was bolted in such a manner that a special wrench was needed to detach it. Only the foremen, who had custody of the wrench, or someone under their direct supervision were permitted to remove or ever removed the guide guard.

The factory had been running on a twenty-four hour basis with 3 eight-hour shifts. On the night in question Cepeda was to have worked from midnight to 8:00 A.M. When he commenced work, the machine was operating without the guide guard. Presumably it had been removed by a foreman on the preceding shift. Cepeda operated the machine for 3 hours that night without mishap. His foreman did not attempt to replace the guide guard during that period and it

would appear that Cepeda's continued operation was with the consent and approval of his superior. The foreman was nearby when the accident occurred, and he ran and turned the machine off.

Previously Cepeda had been told by one foreman that "he should never remove the guard from the machine because the machine could take his hand and whole arm off * * *." But he had not removed the guide guard and under all the circumstances it is clear his operation of the machine was sanctioned and approved. The defendant produced no evidence to demonstrate the manner in which Cepeda operated the machine on the night in question other than the fact that his left hand was caught in the ribbons of plastic which were being fed into the machine and his hand was pulled into the rollers by the plastic.

The linchpin of the majority's analysis is Comment n to Section 402A of the *Restatement* (*Second*) *of Torts* (1965), which may be summarized as holding that "the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense * * *." There is to be sure a certain superficial appeal in applying this precept to the facts of this case. However, upon closer analysis, it is obvious that neither logic nor policy supports its applicability to a situation where an employee, at work, is injured using a machine which should have been inoperable.

In *Meistrich v. Casino Arena Attractions, Inc.,* 31 *N. J.* 44 (1959), Chief Justice Weintraub clarified the doctrine of assumption of risk in the hope that its use would no longer lead to confused thinking in the area of contributory negligence.[1] The Chief Justice observed that assumption of risk

---

[1] The Chief Justice's analysis has been characterized as the leading judicial support for the proposition that "the doctrine [of assumption of risk] deserves no separate existence * * *." James, "Assumption of Risk: Unhappy Reincarnation," 78 *Yale L. J.* 185, 197 (1968).

had a dual aspect. In one sense, it simply meant that no duty existed. Thus, when a person voluntarily and knowingly subjected himself to a situation in which injury might occur, recovery might be proscribed because no duty was owed. By going to a baseball game and sitting in the stands, a patron knew that he might be hit by a foul ball. Having voluntarily and knowingly positioned himself so that he might be subject to that mishap, the spectator was not entitled to recovery because no duty existed either from the owner of the team or the batter.

The second aspect of assumption of risk applied only where a duty existed, and was merely a form of contributory negligence. Its constituent elements were either that the voluntary and knowing exposure to a dangerous situation under the circumstances was unreasonable or that plaintiff's conduct during such exposure was improper. It is significant that the knowing and voluntary placing of oneself in the risk situation was not enough. There had to be the further factor — the negligent conduct of the plaintiff. If, for instance, a duty to protect spectators were found to exist in the ballpark example, then the spectator's contributory negligence would have to be based upon some independent act or omission other than his having voluntarily and knowingly positioned himself at the ballpark. Otherwise, the duty would be meaningless.

An apt illustration referred to by the Chief Justice in *Meistrich* was the employer's duty to furnish an employee with a safe place to work. Once that duty had been discharged, the employer would not be responsible to the employee for the remaining inherent employment risks. Reference to assumption of risk in that situation was truly stating

---

This discussion is undertaken despite our hope that we had heard the last of assumption of risk. *McGrath v. American Cyanamid Co.*, 41 *N. J.* 272 (1963). It has been urged that the term and concept be abolished because "[i]t adds nothing to modern law except confusion." 2 *F. Harper & F. James, Law of Torts*, § 21.8, at 1191 (1956).

that the employer was not negligent. However, even if the employer failed to provide a safe place to work, the employee's recovery would be barred upon a showing that the employee's injury was due to his carelessness. The Chief Justice pointed out that the failure to recognize these two aspects of assumption of risk had led to confusion and harsh results. Employees might be denied recovery because of their voluntary exposure to those very risks of employment which the employer had a duty to eliminate.

The majority opinion recognizes, and I agree, that the jury properly found that the defendant manufacturer had violated its duty to equip the pelletizing machine with a safety device, an interlock, so that the machine could not operate when the guide guard was removed.[2] The manufacturer's duty encompassed not simply a duty to warn, but an obligation to make the machine inoperable when the guide guard was removed. It therefore follows that assumption of risk in the primary sense, namely no duty, has been negated. A finding of contributory negligence then must be predicated upon something other than the plaintiff's positional risk.

As noted previously, and as the majority concedes, the defendant has not established that the plaintiff operated the machine in a careless fashion. Nor does the record demonstrate that Cepeda voluntarily and knowingly exposed himself unreasonably to the risk of operating the machine. The majority's contention that he had a choice not to operate the machine is speculative and wholly conjectural. This 18-year-old Santo Domingan, who had only completed the second grade in his native land, had worked on a farm until he came to this country when he was 16. He did not read or speak English. His foreman communicated with him in

---

[2]The defect in the machine was due to the defendant's failure to design the equipment properly. The majority recognizes that in that context strict liability and negligence merge. 76 *N. J.* at 171–172. For analysis purposes I have referred to the defendant's obligation in negligence terms.

Spanish. When Cepeda commenced work on April 3, 1968, the machine was operable, the guide guard was not on, and his foreman did not in any way advise or warn him not to work. Cepeda then ran the machine for 3 hours. Under these circumstances the only reasonable conclusions which may be drawn are that the employer approved Cepeda's operations, that Cepeda believed he had to work, that he did in fact further his employer's interests, and that he thought he would not be harmed if he acted carefully. None of this adds up to a satisfactory burden of proof showing by the defendant that Cepeda voluntarily and knowingly exposed himself unreasonably to the risk of using the machine without the guide guard.

Even if the defendant had adduced sufficient evidence to demonstrate that Cepeda had acted unreasonably, that defense should not be available when the fulfillment of the defendant's duty would have made the machine inoperable. Relieving the defendant from liability for breach of its duty on the ground that the plaintiff's decision to operate the machine was unreasonable, albeit he operated it carefully, would result in the law defeating itself. It would apply a doctrine based on the idea that an actor owes no duty of affirmative care to protect employees in a situation in which the law has imposed just such a duty. Contributory negligence cannot and should not be based simply on the fact that the employee operated the machine. Such a stance is in direct conflict with the duty imposed on the manufacturer to produce a machine which would not operate with the guard off. This duty complements the employer's general common law obligation to furnish the employee with a safe place to work.

It can thus be seen that imposition of the duty on the manufacturer to make the machine inoperable means that the law does not accept the user's ability to take care of himself as an adequate safeguard of interests which society seeks to protect. This is particularly so with respect to employees, who generally have limited occupational choices, a fact realistically acknowledged in *Bexiga v. Havir Manufacturing*

*Corp., supra,* which held that as a matter of public policy and justice an employee should not be precluded from recovery because of remaining on the job.[3] Accordingly, some

[3]The majority attempts to comprehend *Bexiga* on the basis of a partial analysis of two previous decisions of this Court, meanwhile omitting a third and the most significant one. In *Cintrone v. Hertz Truck Leasing, etc.*, 45 *N. J.* 434 (1965), the Court for the first time considered whether contributory negligence was an appropriate defense in a strict liability context. The evidence could have supported a finding that the plaintiff, a passenger in a truck which was furnished and maintained by the defendant for the plaintiff's employer, might have been guilty of contributory negligence because there was some proof that the employee, fully aware of a brake defect, which caused the accident, rode in the truck anyway. Justice Francis, writing for the Court, referred to the similarity of the nature of the contributory negligence in the case, that is, the type of conduct of the plaintiff, to that alluded to in Comment n to Section 402A of the *Restatement*, citing at the same point *Meistrich v. Casino Arena Attractions, Inc.* The reference to *Meistrich* could only have been to cast doubt on the assumption of risk approach in the *Restatement*.

In *Ettin v. Ava Truck Leasing, Inc.*, 53 *N. J.* 463 (1969), Justice Jacobs held that there was no evidence of negligence on the part of a driver when the brakes failed as he applied them halfway down a hill. He reviewed the uncertain developing field of contributory negligence in strict liability without adopting any one standard.

The only complete discussion of the general problem of contributory negligence in the strict liability field in which this Court stated the principle to be followed was in *Maiorino v. Weco Products Co.*, 45 *N. J.* 570 (1965), decided on the same day as *Cintrone*. There the plaintiff suffered a lacerated wrist while attempting to open a glass container in which a new toothbrush was packaged. Suit against the manufacturer was based on negligence and breach of warranty. The jury found plaintiff guilty of contributory negligence. A unanimous court wrote:

Simply stated, we are of the view that where a plaintiff acts or fails to act as a reasonably prudent man in connection with use of a warranted product or one which comes into his hands under circumstances imposing strict liability on the maker or vendor or lessor, and such conduct proximately contributes to his injury, he cannot recover. In short, in our judgment the well known principle of contributory negligence in its broad sense is sufficiently comprehensive to encompass all the variant notions expressed in the cited cases as a basis for refusing plaintiff a recovery when his own lack of reasonable care joined or concurred with the defect

of the burden of looking out for the user is placed on the manufacturer. Furthermore, imposition of this burden should more probably lead to accident avoidance. *G. Calabresi, The Costs of Accidents* 245–246 (1970) ; *The Research Group, Inc., Interagency Task Force on Product Liability, IV Final Report of the Legal Study* 34–36 (U. S. Dept. Commerce 1977).

*Bexiga* and its companion case, *Finnegan v. Havir Manufacturing Corp.*, 60 *N. J.* 413 (1972), concerned design defects in a punch press. The employee placed a metal disc on top of a die and by depressing a foot pedal activated the machine so that a ram then descended upon the disc and punched holes in it. Liability was predicated on a design defect, namely the manufacturer's failure to incorporate a safety device to prevent the operator's hands from entering the danger area when the ram was activated. The *Bexiga* court pointed out that the plaintiff's negligence — placing his hand under the ram while at the same time depressing the foot pedal — was the "very eventuality the safety devices were designed to guard against." *Id.* at 412. It reasoned that "[i]t would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty re-

---

in the defendant's product as a proximate cause of the mishap and his injury. A manufacturer or seller is entitled to expect a normal use of his product. The reach of the doctrine of strict liability in tort in favor of the consumer should not be extended so as to negate that expectation. [*Id.* at 574]

I do not reject, as the majority apparently does, this statement. 76 *N. J.* at 185–186, and n. 7.

Proximate cause remains as a necessary ingredient of contributory negligence. The question must be asked whether the plaintiff's failure to act as a reasonably prudent person was a cause in fact of the accident or injury. Here, a jury could have found that no accident would have occurred if defendant had fulfilled its duty of making the machine inoperable in the absence of the guide guard and therefore that plaintiff's carelessness was not a proximate cause of the accident. The jury in this case may have reached these conclusions when it found plaintiff guilty of contributory negligence but found that such negligence was not a proximate cause of the accident.

sults in no liability for the very injury the duty was meant to protect against." *Id.* Under those circumstances the "interests of justice dictate that contributory negligence be unavailable as a defense to either the negligence or strict liability claims." *Id.*

The policy justification for *Bexiga* is sound. As in *Bexiga,* it would be incongruous indeed to hold that Cepeda by operating the machine at his job assumed the risk of the manufacturer's negligence. The interests of justice which extinguished the contributory negligence defense in *Bexiga,* in which it was contemplated the machine could operate with or without the guard, are even more persuasive here where the machine should have been inoperable without the guide guard. Professor Fleming James, an outstanding authority in the field of torts, has espoused precisely the same policy view in the manufacturing design defect field. James, "Assumption of Risk: Unhappy Reincarnation," 78 *Yale L. J.* 185, 192 (1968). Professor Marschall has commented in a comprehensive article, Marschall, "An Obvious Wrong Does Not Make a Right: Manufacturers' Liability for Patently Dangerous Products," 48 *N. Y. U. L. Rev.* 1065 (1973), that once a defendant's breach of duty in a negligent design case is established

only intentional and unreasonable conduct, never mere inadvertence, should defeat the plaintiff's right to recover. For the most part, traditional notions of contributory negligence and assumption of risk should disappear. *In particular, when the probability of the plaintiff's inadvertence is foreseeable and the manufacturer has the capacity to guard against that contingency, he should not be released from his duty toward plaintiff simply because the danger is obvious.* As the *Bexiga* court so correctly perceived, the defendant's duty to provide safeguards against obvious dangers is imposed precisely to prevent harm to inadvertent users. Therefore, the user's foreseeable conduct would not negate the duty. [*Id.* at 1090 (footnotes omitted; emphasis supplied)]

Another commentary has stated that "[t]he refusal to allow a contributory negligence defense seems well justified in *Bexiga,* and indeed in almost any case where a factory

worker is injured while using an unreasonably dangerous machine for its intended purpose." Note, 86 *Harv. L. Rev.* 923, 930 (1973).

I am generally in accord with the policy articulated by these commentators. The defendant manufacturer should not be permitted to escape from the breach of its duty to an employee while carrying out his assigned task when observance of that duty would have prevented the very accident which occurred. The so-called choice available to Cepeda was illusory.

I join in the majority's opinion with respect to the refusal to grant certain of the defendant's requests to charge. 76 *N.J.* at 194. I also agree with its comments concerning the trial court's statements with respect to the testimony involving the safety regulations of the State Department of Labor. *Id.* at 192–193. I find, however, that the defendant suffered no prejudicial error since it subsequently introduced evidence of general compliance with safety standards.

I would reverse the judgment of the Appellate Division and reinstate the judgment entered by the trial court.

Chief Justice HUGHES and Justice PASHMAN join in this opinion.

*For reversal and remandment*—Justices MOUNTAIN, SULLIVAN and CLIFFORD and Judge CONFORD—4.

*Concurring and dissenting*—Chief Justice HUGHES and Justices PASHMAN and SCHREIBER—3.